# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MAUI JIM, INC., an Illinois Corporation | ) |
| | ) Case No. 1:16-cv-09788 |
| Plaintiff, | ) |
| | ) District Judge Marvin E. Aspen |
| v. | ) Magistrate Judge Jeffrey T. Gilbert |
| | ) |
| SMARTBUY GURU ENTERPRISES, a Cayman Island Company, MOTION GLOBAL LTD., a Hong Kong Company, SMARTBUYGLASSES SOCIETÁ A RESPONSABILITÁ LIMITATA, an Italian Company, SMARTBUYGLASSES OPTICAL LIMITED, a Hong Kong company, | ) ) ) ) *** PUBLIC VERSION *** ) ) ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO
EXCLUDE SURVEY AND TESTIMONY OF BRIAN M. SOWERS**

{8146486:3 }

# INTRODUCTION

Maui Jim retained Brian Sowers to conduct a survey to test whether consumers viewing SmartBuyGlasses' website mistakenly conclude that SmartBuyGlasses is an "authorized retailer" of Maui Jim. The survey is so flawed that this Court should exclude it and Mr. Sower's related testimony.

Infecting the entire survey is Mr. Sowers' failure to determine how respondents understood the term "authorized retailer." Mr. Sowers never defined the critical term; admitted that he did not know how the survey respondents understood that term; did nothing to determine how survey respondents understood the term; and could not say whether the survey respondents might have had a different understanding of the term from the one Mr. Sowers intended. As Dr. Howard Greenwald – a survey research professor with more than 40 years experience in the field – instructed:

> Because [Mr.] Sowers' conclusion is based on a specific definition and understanding of authorized retailer (*i.e.*, a retailer that Maui Jim specifically authorized to sell its goods online) and that term could be understood otherwise (*e.g.*, a retailer who is legally authorized to sell Maui Jim goods online), the survey results are meaningless.

Indeed, the Reference Guide on Survey Research, which Mr. Sowers admits sets forth generally accepted principles of survey research, warns that unclear survey questions "threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question."

Mr. Sowers' other survey design decisions and data analysis compounded this fundamental flaw. Incredibly, the control question Mr. Sowers devised to determine level of guessing and other survey noise was untested and – in reality – removed less than 5% of the

noise. In other words, the control failed to capture more than 95% of the factors other than the content of the SmartBuyGlasses web site that could lead to a respondent's misperception that SmartBuyGlasses was an authorized retailer of Maui Jim (*e.g.*, factors such as the respondent's confusion, level of intelligence, mental state, reading skill, demographics, or care).

Moreover, Mr. Sowers' survey inappropriately failed to select a population that reflected the potential purchasers of Maui Jim sunglasses and failed to simulate how potential customers interact with the SmartBuyGlasses site in the real world.

These cumulative fatal flaws in Mr. Sowers survey are so fundamental that the survey has absolutely no value whatsoever. None of its results are based on accepted scientific principles. And because the survey addresses such a key issue in the case (*i.e.*, consumer confusion), its admission would cause extreme prejudice to Defendants. Accordingly, and pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), this Court should exclude the survey and any related testimony under Rules 403 and 702 of the Federal Rules of Evidence.

## ARGUMENT

### I. LEGAL STANDARD

Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The purpose of this "gatekeeping" function is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). A party may challenge both an expert's qualifications and the expert's methodology, as "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Lewis v. Citgo Petroleum Corp.*, 561 F. 3d 698, 705 (7th Cir. 2009) (quoting *Clark v. Takata Corp.*, 192 F. 3d

750, 759 n. 5 (7th Cir. 1999)).

Expert testimony is admissible "when the testimony is reliable and would assist the trier of fact to understand the evidence or determine a fact at issue in a case." *Lewis*, 561 F. 3d at 705. Where the risk of prejudice, confusion, or misleading the jury outweighs the probative value of purported expert testimony, the court may exclude the testimony under Rule 403. *See Daubert*, 509 U.S. at 595. "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis*, 561 F. 3d at 705.

To carry out its gatekeeping role, the trial court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts at issue." *Daubert*, 509 U.S. at 592-93. The court's gatekeeping function is "of heightened importance" in Lanham Act cases given the key role of consumer surveys in establishing likelihood of confusion, and courts should "carefully scrutinize survey evidence." *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (excluding dilution survey and expert testimony regarding trademark confusion). A court "can and should use its power and duties under Rule 403 to exclude evidence with great potential for confusion, unfair prejudice, and waste of time when that evidence would have little probative value." *Simon Property Group LP v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1040 (S.D. Ind. 2000).

## II. MR. SOWERS' SURVEY IS FATALLY FLAWED AND SHOULD BE EXCLUDED

This Court should exclude Mr. Sowers' survey and any related testimony pursuant to *Daubert* and Rules 403 and 702 because the survey suffers from multiple, fatal methodological errors that render the survey meaningless and unduly prejudicial to Defendants.

Courts within the Seventh Circuit have recognized that "expert testimony concerning

survey results may not be reliable if the survey format does not accurately gauge consumer confusion." *Simon Property*, 104 F. Supp. 2d at 1040-41 (barring consumer survey where flaws were "so basic as to strip the proposed survey of any significant probative value"). Other courts have held that "when the deficiencies are so substantial that they render the survey's conclusions untrustworthy, the court should exclude the survey from evidence." *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 (D. N.J. 2002) (excluding survey) (citing *Spraying Systems Co. v. Delavan, Inc.*, 975 F. 2d 387, 394 (7th Cir. 1992)).

Courts consider a variety of factors in evaluating a proffered survey, including whether: (1) the universe of respondents was properly defined; (2) the survey selected a representative sample; (3) the survey used clear, precise, and non-leading questions; (4) interviewers followed sound procedures; (5) data was reported accurately; (6) data was analyzed in accordance with accepted principles; and (7) the entire process was objective. *See The Black & Decker Corp. v. Positec USA Inc.*, No. 11-cv-5426, 2017 WL 4010922, at * 3 (N.D. Ill. Sept. 11, 2017); *see also* Reference Guide on Survey Research ("Reference Guide"), p. 374, *available at* https://www.fjc.gov/content/reference-guide-survey-research-2, *last accessed* Aug. 2, 2019 (stating that "[t]he key issues for the trier of fact concerning the design of the survey are the objectivity and relevance of the questions on the survey and the appropriateness of the population used to guide sample selection.") Applying these standards, courts within the Seventh Circuit have held that "a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant, and thus inadmissible." *Black & Decker*, 2017 WL 4010922, at * 3 (determining after trial that court should have granted *Daubert* motion excluding survey).

Here, Mr. Sowers' survey suffers from at least three distinct, fatal flaws: (1) he based the entire survey around the ambiguous, undefined term "authorized retailer"; (2) his purported

control question explains less than 5% of the overall error due to noise in the survey; and (3) he failed to obtain a representative sample of Maui Jim purchasers and did not replicate real-world consumer experience. In light of these defects, the survey can be of no use to the jury or the Court on summary judgment, and instead risks misleading the factfinder on a key element of Maui Jim's claims.

### A. Mr. Sowers' Improperly Based His Entire Survey On An Ambiguous, Undefined Term

Mr. Sowers' conclusion that SmartBuyGlasses' website misled potential Maui Jim purchasers comes from responses to a single question: "Based on the webpages, do you or do you not believe that SmartBuyGlasses is an authorized retailer of Maui Jim Sunglasses?" (Expert Report of Brian M. Sowers ("Sowers Report"), ¶ 36, attached hereto as **Exhibit 1**.) Because the term "authorized retailer" is both ambiguous and undefined, that question violates fundamental principles of survey design and sheds no meaningful light on the proposition that Mr. Sowers set out to test.

The Reference Guide makes clear that "[w]hen unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question." Reference Guide p. 388. Significantly, "[e]ven questions that appear clear can convey unexpected meanings and ambiguities to potential respondents." Reference Guide, p. 387. And "[i]f the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey." *Id*. at 388. Thus, "well-accepted survey methodology standards warn against inclusion of questions which cannot be understood by survey respondents or which the respondent is not equipped to answer." (Corrected Expert Witness Report of Howard P. Greenwald, Ph.D. ("Dr. Greenwald Report"). ¶ 55, attached hereto

as **Exhibit 2**.)

Here, Mr. Sowers' survey turns entirely on the phrase "authorized retailer." At no point, however, did Mr. Sowers define that term for survey respondents. (*See* Deposition Transcript of Brian Sowers ("Sowers Tr."), 41:18-23, attached hereto as **Exhibit 3**.) Nor did he make any effort to determine what participants understood the term to mean, despite the fact that he had never previously conducted a survey using that term. (*See* Sowers Tr. 37:6-9; 49:19-50:7.) As a result, Mr. Sowers simply does not know whether different respondents might have had a different understanding of the term from the one Mr. Sowers intended. (*See* Sowers Tr. 41:24-42:3.) Mr. Sowers does not know, for example, whether some or all respondents may have thought "authorized retailer" meant "a retailer who is permitted by law to sell a product" rather than "a retailer who has been authorized by Maui Jim." (*See* Dr. Greenwald Report ¶ 52.)

Consistent with proper survey procedures, Mr. Sowers could – and should – have assessed whether survey respondents were confused about the meaning of the term "authorized retailer" by conducting pretests before running the survey. (*See* Dr. Greenwald report ¶ 56.) Indeed, the Reference Guide, to which Mr. Sowers claims to have adhered (Sowers Report ¶ 13), specifically notes that "[t]exts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous." (Reference Guide at 388.)

Because Mr. Sowers failed to run pretests or otherwise ensure that respondents correctly understood the term "authorized retailer," his survey has no benefit to the trier of fact on the question of confusion. Indeed, courts have recognized that poorly-designed or ambiguous survey questions do not have probative value. In *Scotts Co. v. United Industries Corp.*, 315 F. 3d 264 (4th Cir. 2002), for example, a survey asked respondents whether a weed killer could "prevent" crabgrass but did not specify whether "prevent" meant stopping crabgrass before it started or

killing mature crabgrass. *Id*. at 280. Even though 90% of respondents gave responses that indicated possible confusion, the court held that the survey shed "no light" on the issue because of the ambiguity of the term "prevent." *Id*.; *see also Jackson v. Nat'l Action Fin. Servs.*, 441 F. Supp. 2d 877, 881 (N.D. Ill. 2006) (excluding consumer survey in Fair Debt Collection Act case because "[t]he phrase 'limited-time offer' as used in the survey—without any definition or explanation—is simply too ambiguous to provide any insight into whether the participants were confused as to the meaning"); *Native American Arts, Inc. v. Bud K. World Wide, Inc*., No. 7:10-cv-124, 2012 WL 1833877, at *8 (M.D. Ga. May 18, 2012) ("the Court believes the question regarding the products is ambiguous, requiring the exclusion of the survey"). The same applies here. Accordingly, this Court should exclude the report under Rules 403 and 702 because the term "authorized retailer" is both ambiguous and undefined.

        **B.**      **Mr. Sowers' "Control" Only Removes 5% Of The Error Noise Causes**

Mr. Sowers failed to pretest his control question, which led to an ill-conceived question that removed less than 5% of the error. As Dr. Greenwald teaches, "the methodological challenge [in the litigation context] . . .[is] to demonstrate that the stimulus has *caused* the consumer to think or act in a particular way . . . [O]nly experimental techniques, including both 'experimental' and 'control' subjects, can test causality regarding the consumer's thinking and behavior in response to a stimulus." (Dr. Greenwald Report ¶¶ 61-62.) Indeed, the Reference Guide cautions that:

> [w]ithout the control group, it is not possible to determine how much of the [purported confusion] is attributable to respondents' preexisting beliefs or other background noise (*e.g.*, respondents who misunderstand the question or misstate their responses) …
>
> In an extreme case, an inappropriate control may do nothing more than control for the effect of the nature or wording of the survey questions.

(Reference Guide, p. 398-400.) Mr. Sowers' survey did not include a control group or even a control question that removed any meaningful error.

Instead of a separate control group, Mr. Sowers attempted to create a "within condition" control question. Specifically, after asking the "authorized retailer" question, Mr. Sowers asked respondents whether they believed SmartBuyGlasses offered a buy-two-get-one-free promotion on Maui Jim sunglasses, a promotion SmartBuyGlasses does not offer. (*See* Sowers Report ¶ 37.) 54.5% of respondents said they thought SmartBuyGlasses offered such a promotion when no such promotion was offered on the site. (*See* Sowers Report ¶ 37.) Mr. Sowers subtracted this 54.5% from the 94.6% of respondents who said they believed SmartBuyGlasses was an "authorized retailer" of Maui Jim to arrive at his overall confusion figure of 40.1%. (*See* Sowers Report, ¶ 43.)

While the "within condition" technique is common in trademark litigation, its application must be properly tested and calibrated. (*See* Dr. Greenwald Report ¶ 76.) Here, Mr. Sowers made no effort to determine whether his grossly over-simplistic noise question captured a meaningful amount of relevant noise. (*See* Sowers Tr. 154:12-17.) Nor did he attempt to determine the impact of other sources of noise, such as level of intelligence, education, reading skill, age, or positive-response bias. (*See* Dr. Greenwald Report ¶ 78.)

Had he done so, Mr. Sowers would have discovered that his "noise" question explained only 4.7% of the total variance in answers to the "authorized retailer" question. (*See* Dr. Greenwald report ¶ 80.) In other words, **more than 95% of the reasons that a respondent may conclude that SmartBuyGlasses is an "authorized retailer" of Maui Jim cannot be explained by Mr. Sowers' purported control**. (*See* Dr. Greenwald Report ¶ 80.) Mr. Sowers did not run such a basic analysis, and, in fact, mistakenly claimed such a calculation was impossible. (*See*

Sowers Tr. 148:23-149:6.)

In the absence of a meaningful control, Mr. Sowers is unable to determine whether respondents' answers to the authorized retailer question may have been based on other factors, such as respondents' misunderstanding of what Mr. Sowers meant by "authorized retailer" or the lack of importance that SmartBuyGlasses' status as an authorized retailer would have in potential customers' purchasing decisions. (*See* Dr. Greenwald report, ¶ 67.) Mr. Sowers' conclusion thus has no scientific basis and must be excluded in its entirety.

      C.      **Mr. Sowers Failed To Obtain A Proper Survey Sample And Replicate Real-World Conditions**

A further basis to exclude Mr. Sowers' testimony and survey is his failure to obtain a proper survey sample and replicate real-world conditions during the survey process.

"One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population." Reference Guide at 376. It is axiomatic that "for a survey to be valid, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F. 3d 477, 488 (5th Cir. 2004) (holding that survey was meaningless and did not preclude summary judgment). The Reference Guide emphasizes that "the universe must be defined carefully," as "there may be systematic differences in the responses of members of the population and nonmembers." Reference Guide at 377. That is why "*a survey that provides information about a wholly irrelevant population is itself irrelevant.*" *Id*. at 377-78 (emphasis added).

Courts frequently exclude or substantially discount surveys where the survey fails to sample the correct population. *See, e.g., Leelanau Wine Cellars, Ltd v. Black & Red, Inc.*, 502 F. 3d 504, 518 (6th Cir. 2007) (affirming district court's decision to give little weight to a consumer confusion survey because survey made "no attempt" to survey only adults who would purchase

wine produced in Michigan, rather than wine purchasers as a whole, which the court stated was "undoubtedly a distinct group"); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F. 3d 1136, 1145, 1147 (10th Cir. 2013) (affirming district court ruling that survey failed to support likelihood of confusion where, among other things, expert selected respondents who were potential purchasers of sinus medications in general, rather than particular type of sinus product at issue); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 447 (D. N.J. 2009) (excluding consumer survey and expert testimony where, among other flaws, the survey "failed to identify the correct sample population").

Here, Mr. Sowers defined "potential purchasers" as all U.S. adults who (1) were at least 18 years old; (2) stated they were likely to buy sunglasses online in the next 12 months; and (3) were willing to purchase sunglasses at a price of $150 or higher. (*See* Sowers Report ¶ 17.) Mr. Sowers click balanced his panel to overall U.S. demographics, *not* the demographics of potential Maui Jim purchasers. (*See* Dr. Greenwald Report ¶ 44.) Mr. Sowers also did not weight his panel to account for education, financial status, or other demographic factors beyond age, gender, and geography. (*See* Dr. Greenwald Report ¶ 44.)

Mr. Sowers apparently assumed that all potential purchasers of high-end sunglasses are the same and are equally interested in all available brands. But "[i]ndividual lifestyle categories encompass definite purchasing patterns, and commercial sources are available today to provide samples of individuals within specific lifestyle categories." (Dr. Greenwald Report ¶ 44.) Mr. Sowers did not speak to anyone at Maui Jim or SmartBuyGlasses to determine the characteristics of their customers that might influence purchasing decisions. (*See* Sowers Tr. 73:4-9; 76:21-77:8.) If he had, Maui Jim employees might have told him that ███████████████
████████████████████████████████████████████████████████████████

███████████████████████████████████████

██████████████ (*See* Deposition of Jay Black at 98:11-99:11, attached hereto as **Exhibit 4**; Deposition of Hans Penzek at 157:21-158:6, attached hereto as **Exhibit 5**). Mr. Sowers has apparently never even heard the term ████████████ despite the fact that numerous Maui Jim representatives testified regarding the significance of this term to Maui Jim's sales and marketing efforts. (*See* Sowers Tr. 87:20-24.) Mr. Sowers' failure to account for the unique characteristics of potential Maui Jim consumers violated fundamental survey principles and eliminates any probative value the survey might have. (*See* Greenwald Report, ¶ 44.) It is a "fatal flaw." (Dr. Greenwald Report ¶ 43.) Moreover, his seeming unawareness regarding these flaws "suggests a fundamental lack of the required attention to detail in his survey sample selection." (*See* Dr. Greenwald Report ¶ 43.)

Mr. Sowers' survey is further flawed because he did not adequately ensure that the survey approximated real-world conditions. "Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions." *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) (excluding survey under Rules 403 and 702); *see also Malletier*, 525 F. Supp. 2d at 591 (holding that "[a] survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone."); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1328 (N.D. Ga. 2008) (holding that confusion survey did not replicate actual shopping experience because a typical consumer would take more care before making purchase).

Here, the survey consisted of a "simulated purchasing exercise" that involved viewing screenshots of the SmartBuyGlasses site. (*See* Sowers Report ¶ 20.) Participants were aware

from the beginning that they would not actually be buying any products from SmartBuyGlasses. (*See* Sowers Tr. 94:12-17.) However, "[i]t is likely that actual customers purchasing premium items would think differently, have different concerns, and pay closer attention to details of an offer on the web than would respondents to a survey in which it was emphasized that they would be making no financial commitment." (*See* Dr. Greenwald Report ¶ 69.)

And, while participants were required to spend at least 10 seconds on each survey page, Mr. Sowers did not monitor how long any participant spent reviewing pages or whether the participant clicked on any links. (*See* Sowers Tr. 128:11-129:2). Participants completed the survey in a single session, and more than half of respondents spent six minutes or fewer on the survey. (*See* Dr. Greenwald report, ¶ 70). In stark contrast, the average customer spends ███ ████████████████████████████████████████ (*See* Dr. Greenwald report ¶ 70.) Remarkably, Mr. Sowers admits he did not request any information about typical consumer behavior on either the SmartBuyGlasses website or Maui Jim's website before designing his survey. (*See* Sowers Tr. 64:14-18; 67:3-8.) Mr. Sowers also failed to review any academic or scientific studies regarding typical behavior of online consumers. (*See* Sowers Tr. 72:17-23.) Accordingly, this Court should exclude Mr. Sowers' survey and related testimony because Mr. Sowers failed to ensure that his survey would adequately mirror real world experiences.

D. **The Prejudicial Effect of the Survey Outweighs Any Limited Probative Value**

In light of its myriad flaws, admission of the survey would cause severe prejudice to SmartBuyGlasses. Mr. Sowers' survey purports to find that more than 40% of respondents get a mistaken impression from the SmartBuyGlasses site. Allowing Maui Jim to present that figure on one of the most important issues in the case could cause significant and unwarranted damage SmartBuyGlasses' position, particularly when more than 95% of the error in his survey remains

unexplained. That harm is wholly unwarranted given the survey's nonexistent probative value. As a result, this Court should exclude the survey under Rule 403 to prevent undue prejudice to SmartBuyGlasses. *See Simon*, 104 F. Supp. 2d at 1052 (excluding surveys under Rule 403 when risk of unfair prejudice and confusion outweighed surveys' limited probative value).

## CONCLUSION

For the foregoing reasons, this court should exclude Mr. Sowers' survey and any related testimony pursuant to Rules 702 and 403 of the Federal Rules of Evidence.

Dated: August 2, 2019

Respectfully submitted,

SMARTBUY GURU ENTERPRISES, MOTION GLOBAL LTD., SMARTBUYGLASSES SOCIETÁ A RESPONSABILITÁ LIMITATA, SMARTBUYGLASSES OPTICAL LIMITED

By: /s/ Stephen J. Rosenfeld
One of their attorneys

Stephen J. Rosenfeld (Bar No. 6216769)
Jennifer D. Armstrong
Jacob D. Radecki
McDonald Hopkins LLC
300 North LaSalle, Suite 1400
Chicago, IL 60654
Phone: (312) 642-6103
Attorneys for Defendants
E-mail: srosenfeld@mcdonaldhopkins.com
    jarmstrong@mcdonaldhopkins.com
    jradecki@mcdonaldhopkins.com

{8146486:3 }

## CERTIFICATE OF SERVICE

      This is to certify that on August 2, 2019, Stephen J. Rosenfeld, an attorney, caused to be served a true and correct copy of the foregoing document via electronic mail on all counsel of record who have consented to electronic service.

      /s/ *Stephen J. Rosenfeld*

{8146486:3 }