# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MAUI JIM, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | No. 1:16 CV 9788 |
| | ) | Hon. Marvin E. Aspen |
| SMARTBUY GURU ENTERPRISES, | ) | |
| MOTION GLOBAL LTD., | ) | |
| SMARTBUYGLASSES SOCIETA | ) | |
| A RESPONSABILITA LIMITATA, | ) | |
| SMARTBUYGLASSES OPTICAL | ) | |
| LIMITED, | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaimants. | ) | |

**REDACTED PUBLIC VERSION of MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

This is a voluminous intellectual property lawsuit with over 500 docket entries to date. Plaintiff Maui Jim, Inc. ("Maui Jim") alleges that the defendants sell non-genuine Maui-Jim-branded sunglasses while using its copyrighted photographs to falsely advertise that they are an authorized retailer. The defendants (collectively "Defendants," "SmartBuyGlasses," "SBG," or "Counterclaimants") counterclaim that Maui Jim's statements about their legitimacy amounts to defamation or, alternatively, warrant damages for unjust enrichment. Presently before us are Maui Jim's motions for summary judgment (Pl.'s Counterclaim MSJ (Dkt. No. 420); Pl.'s Copyright MSJ (Dkt. No. 423); Pl.'s MSJ on Lanham Act and Related State Law Claims ("Lanham MSJ") (Dkt. No. 426)) and Defendants' motion for summary judgment in their favor

on both Maui Jim's claims and their counterclaims. (Defs.' MSJ (Dkt. No. 412).).[1] Also before us is Defendants' motion for reconsideration of our ruling on their earlier motion to dismiss. (Mot. for Reconsideration (Dkt. No. 378).) For the reasons stated below, Maui Jim's motions for summary judgment are granted in part and denied in part, Defendants' motion for summary judgment is granted in part and denied in part, and Defendants' motion for reconsideration is denied.

## BACKGROUND

Unless otherwise stated, the facts described herein are undisputed and culled from the parties' multiple Local Rule 56.1 submissions.

### A. Parties

Maui Jim is a designer, manufacturer, and provider of premium prescription and non-prescription sunglasses. (Defs.' Resp. to Pl.'s Lanham SOF (Dkt. 459) ¶ 1.) Maui Jim's sunglasses are marketed, offered, and sold globally. (*Id.*) Defendants retail designer eyewear and they sell products into the United States through websites like SmartBuyGlasses.com. (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶¶ 1, 45.) These sales include eyewear displaying Maui Jim's marks. (Defs.' Resp. to Pl.'s Lanham SOF ¶ 35.) Defendants sold approximately ███████ non-prescription and ███ prescription pairs of Maui-Jim-branded sunglasses into the United States between 2009 and 2019. (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 6.) These prescription sunglasses contained third-party prescription lenses glazed into a Maui-Jim-branded frame. (*Id.*)

---

[1] Maui Jim does not move for summary judgment on its claims for trademark dilution and tortious interference with its third-party contracts. (Pl.'s Mem. Lanham MSJ (Dkt. No. 427) at 39.)

##### B.    Intellectual Property

Maui Jim offers over 125 different sunglasses styles under one or more of its marks.

(*Id.* ¶ 6.)  Maui Jim's sunglasses incorporate Maui Jim's patented, color-infused lens technology

that wipe out glare and UV rays, and boosts color via lens treatments. (*Id.* ¶ 7.)  Maui Jim's

sunglasses all have earned the Skin Cancer Foundation's Seal of Recommendation as an

effective UV filter for the eyes and surrounding skin. (*Id.* ¶ 14.)  Since at least the early 1980s,

Maui Jim continuously used the following marks in selling sunglasses in U.S. commerce:

| Mark | Goods | Reg. No. | Reg. Date |
|------|-------|----------|-----------|
| MAUI JIM | Clothing, namely t-shirts; sunglasses | 1404711 | August 12, 1986 |
| *Maui Jim* | Sunglasses | 3443858 | June 10, 2008 |
| *Maui Jim* | Sunglasses | 1465234 | November 17, 1987 |
| *Maui Jim* | Clothing, namely, t-shirts, polo shirts, tank tops, hats, visors, sweatshirts and jackets; sunglasses | 4547944 | June 10, 2014 |

(*Id.* ¶ 2) (sic.)  Maui Jim registered these as trademarks with the U.S. Patent & Trademark

Office. (*Id.* ¶ 5.)

The U.S. Copyright Office issued Certificates of Registration for the ninety-three

professional photographs ("93 Photographs") at issue in this case. (Defs.' Resp. to Pl.'s

Copyright SOF (Dkt. No. 461) ¶¶ 7–9.)  Maui Jim published its 93 Photographs either on its

website or in print between March 2015 and April 2016. (*Id.* ¶¶ 20–21.) Each registration was

issued within five years of Maui Jim's first publication of the photograph. (*Id.* ¶ 8.) Twenty-two of those photographs ("22 Photographs") were taken between March 27 and October 22, 2015. (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 108.)  Those 22 Photographs were registered on August 8, 2016. (*Id.*)

Since 2009, Maui Jim invested nearly ███████████ in marketing its Maui Jim sunglasses, including its marks, as a high-quality premium product. (*Id.* ¶ 10.)  For example, Maui Jim prominently uses these marks in TV commercials, print advertisements, brochures, social media, and other digital advertising, marketing, and promotional campaigns. (*Id.* ¶ 11.) Maui Jim's TV commercials have aired on major networks like NBC, CBS, ABC, HGTV, Discovery Channel, Food Network, and ESPN. (*Id.*) Maui Jim also promotes its sunglasses on its website, www.mauijim.com, where it publicly displays photographs of the sunglasses. (Defs.' Resp. to Pl.'s Copyright SOF (Dkt. No. 461) ¶ 7.)

Maui Jim's website contains the following notice at the bottom of each page: "© [applicable year] MAUI JIM, INC." (Defs.' Resp. to Pl.'s Copyright SOF (Dkt. No. 461) ¶¶ 9.) Additionally, the "Intellectual Property Notice" section of Maui Jim's Terms of Use webpage states:

> Unless otherwise noted, all materials, including text, illustrations, *photographs*, designs, graphics, logos, button icons, *images*, audio clips, software, written and other material (collectively, the "Contents") are *copyrights* . . . owned, controlled or licensed by Maui Jim, Inc.

(*Id.* ¶ 10) (emphasis added.)  But the parties dispute whether these notices are expressly associated with any of the 93 Photographs. (*Id.*)

Defendants had access to Maui Jim's 93 Photographs. (*Id.* ¶ 21.)  Although Defendants did not independently take or create any of the relevant Maui Jim-branded sunglasses that it

displayed on its website,[2] they dispute whether their website displayed Maui Jim's 93 Photographs. (*Id.* ¶¶ 14–16, 18–19, 28.)[3]  The parties dispute whether Maui Jim's purported acquiescence granted Defendants a license to use Maui Jim's 93 Photographs. (*Id.* ¶¶ 29–31.)

### C.    Retail

Maui Jim and its wholly-owned distributors sell Maui Jim sunglasses through an authorized retailer program. (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 17.)  Each authorized retailer enters into a written agreement with Maui Jim and/or Maui Jim USA, Inc. that governs the business relationship, outlines Maui Jim's terms and conditions, and references its U.S. General Policies. (*Id.* ¶ 21.) Defendants do not dispute that Maui Jim purports to have a policy governing its business relationships with authorized retailers. (*Id.*) That authorized retailer program permits certain retail establishments to sell Maui Jim sunglasses to consumers. (*Id.*) The parties dispute whether Maui Jim's authorized U.S. retailers purchase Maui Jim sunglasses exclusively from Maui Jim or whether they obtain Maui-Jim-branded sunglasses from additional sources. (*Id.* ¶ 20.)  It is undisputed that SmartBuyGlasses is not within Maui Jim's authorized retailer program. (*Id.* ¶ 31.)  But Defendants do dispute whether they are authorized to sell Maui Jim sunglasses as a matter of law.

Maui Jim states that it requires all Maui Jim sunglasses be sold with authentic Maui Jim lenses, frames, and parts, and not modified in any manner. (*Id.* ¶ 22.)  Defendants dispute that

---

[2] For example, when Maui Jim asked Defendants' 30(b)(6) witness whether Defendants took any of the 93 Photographs of Maui Jim sunglasses they displayed on its website, he testified "Not that I can recall." (*Id.* ¶ 18) (internal citation omitted).)

[3] Maui Jim's Exhibit 9 to its Memorandum in Support of its Copyright Summary Judgment Motion is a chart allegedly showing excerpts from Defendants' website that displays what appears to be Maui Jim's 93 Photographs.  (Pl.'s Mem. Copyright MSJ Ex. 9 (Dkt. 425–1).) This chart includes five columns: Style Name, Title of Work, Date of Registration and Registration Number, Maui Jim Copyrighted Image, and Image Reproduced on SmartBuyWebsite. (*Id.*)

averment, citing to the fact that nothing in Maui Jim's European authorized retailer agreements stated that its warranty would be voided if an authorized retailer sold Maui Jim sunglasses to third parties or if third-party lenses were glazed into its frames. (*Id.*) Defendants also dispute this fact by claiming that Maui Jim authorized retailers in the U.S. had glazed third-party lenses into Maui Jim's frames without consequence. (*Id.*)

Maui Jim states that authorized retailers are *required* to direct all consumer repair requests to Maui Jim's trained repair technicians. (*Id.* ¶ 26.) Defendants dispute that fact because of a small font general policy attached to Maui Jim's CFO Paul Lippens' declaration that states "We *recommend* that you or your customer call us on our toll-free number . . . regarding any repair questions." (*Id.* ¶ 26 (citing Lippens Dec. (Dkt. No. 428-4) at 9) (emphasis added).)

It is undisputed that Maui Jim provides warranty protection for its sunglasses. (Defs.' Resp. to Pl.'s Lanham SOF (Dkt. 459) ¶ 27.) But the parties dispute whether Maui Jim's warranty only covers those Maui Jim sunglasses sold by Maui Jim and its authorized retailers. (*Id.*) Maui Jim believes that Defendants' warranty is different from its own. (*Id.* ¶ 63.) Defendants disagree and contend that their own warranty provides identical coverage. (*Id.*) The parties dispute whether Maui Jim's warranty is an integral part of its customer service offering that consumers have come to expect and enjoy from the Maui Jim brand. (*Id.* ¶ 30.) Defendants' dispute is premised on the fact that ███████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ According to Maui Jim's head of Customer Care, Lynn Campen, customers do use Maui Jim's repair department, at average, three to four non-Maui Jim prescription lenses per week between 2015 and 2018. (Pl.'s Resp. to Defs.' SOF (Dkt. 466) ¶ 70(f).)

Defendants ship all their Maui-Jim-branded sunglasses sold to the United States from Hong Kong, so international shipping regulations and procedures govern their shipments. (*Id.* ¶ 48.) Defendants create commercial invoices for the products they ship. (*Id.* ¶ 49.) An uncertain number of Defendants' shipments of Maui-Jim-branded sunglasses contained a packaging slip that identified ███████ as the manufacturer. (*Id.* 51.) ███████ does not manufacture Maui-Jim-branded sunglasses, and Defendants know that. (*Id.* ¶ 47.) Defendants blame the ███████ identification mishap on faulty computer coding that operated from ███████ (*Id.* ¶ 51.) Defendants' sales documents show that it shipped at least ███████ pairs of Maui-Jim-branded sunglasses into the U.S. during that time frame. (*Id.* ¶ 52.) Customer complaints brought this error to Defendants' attention. (*Id.* ¶¶ 54–56.) For one example:

> I received [the shipment] from eyeware manufacturer ███████ that was initiated by you SmartBuyGlasses.com for a replacement pair of Maui Jim Sunglasses . . . . On ███████ website – there is no mention that they sell Maui Jim products or an authorized retailer for Maui Jim…I would like to know if these were manufactured by Maui Jim or are they a copy of Maui Jim product"

(*Id.* ¶ 53 (second ellipsis in original) (sic).) As for another inaccuracy in Defendants' shipments, Defendants admit that it included a Maui Jim's 2009 Drop Ball Certification (a certification that lenses comply with certain regulatory requirements) in a limited number of shipments to U.S. consumers. (*Id.* ¶¶ 43–45.) These shipments were made without Maui Jim's consent and they were not certified under the 2009 Drop Ball Certification. (*Id.*)

The parties dispute whether they received inquiries from consumers and potential consumers complaining about Defendants' delayed shipment speeds with respect to Maui-Jim-branded sunglasses. (*Id.* ¶ 61.) Nevertheless, Defendants admit to at least twenty examples of delayed shipments to its purchasers of Maui-Jim-branded sunglasses, thirteen of which were delayed due to U.S. Food and Drug Administration ("FDA") or customs issues. (*Id.*)

### D.    Defendants' Advertising

The parties dispute whether customers and potential customers were confused over Defendants' allegedly false and/or misleading statements. (*Id.* ¶ 65.)  Defendants' webpage touts the supposed authenticity of eyewear that it sells from "some of the world's leading eyewear manufacturers." (*Id.* ¶ 66.)  It also touts their "relationships with some of the world's leading suppliers." (*Id.* ¶ 67.)  Defendants' webpage once contained the following diagram:



(*Id.* ¶ 68 (citing Ex. 35).)  This diagram suggests that Defendants' supply chain is direct from the manufacturer to the customer rather than the "traditional supply chain" that routes from the manufacturer to an exporter to an importer to a wholesaler to a shop and then to a customer. (*Id.*).  That diagram also contained the following accompanying sentence: "By offering the world's largest range of authentic designer eyewear, sourced directly from the world's leading eyewear [sic] suppliers, we are here to help you find what you love." (*Id.*)  Defendants dispute that this diagram was factually misleading, stating that it "was accurate and consistent with SmartBuyGlasses' practice for the majority of its sales including manufacturers/brands – such as ████████ and ██████ – from which it buys genuine products from the manufacturer of the brands and ships it to its consumers." (*Id.*)

The following statement has appeared on Defendants' website's FAQ, and Maui Jim disputes whether it is truthful:



**CAN I TRUST THE AUTHENTICITY OF THE PRODUCTS?**

All of our products have a 100% Authenticity Guarantee, no exceptions. SmartBuyGlasses takes great lengths to ensure the high quality and product authenticity that our customers have come to expect, and all products are accompanied with official tags and manufacturer warranties.

CONTACT US >

(*Id.* ¶ 69 (citing Ex. 36).)

Elsewhere on Defendants' website is a statement that "SmartBuyGlasses is not affiliated with nor an official re-seller for Maui Jim . . . ." (*Id.* ¶ 69.) Maui Jim commissioned a survey coined the Sowers Survey to test whether Defendants' website misleads consumers into believing that Defendants are an authorized retailer of Maui Jim sunglasses. (*Id.* ¶ 70 (citing Ex. 20 (Dkt. No. 428–20 at 6)).) Accounting for "noise," 40.1% of respondents to the Sowers Survey took away the false impression that SmartBuyGlasses is an authorized retailer of Maui Jim sunglasses. (*Id.*)[4]

The following disclaimer appears in small type on the bottom of SmartBuyGlasses.com:



TERMS & CONDITIONS | PRIVACY POLICY | SITEMAP | JOBS | BRAND TRADEMARKS

SmartBuyGlasses™ is a leading independent retailer of the world's best designer eyewear since 2006 and is not owned by or affiliated with the brands it sells unless stated otherwise. All trademarks and brand names shown on our pages are the property of their respective companies which retain all rights. The SmartBuyGlasses™ trademark is owned by Motion Global Limited.

---

[4] Defendants filed a motion to exclude the Sowers Survey. (Dkt No. 417.) We previously denied that motion. (Dkt. No. 494.) We incorporate the analysis and reasoning contained within our Memorandum Opinion and Order denying the Sowers Survey within this summary judgment Memorandum Opinion and Order. (*Id.*)

(*Id.* ¶ 48.)  That disclaimer states that SmartBuyGlasses is not owned by or affiliated with the brands it sells unless stated otherwise. (*Id.*)  The parties dispute the impact of this sentence.

Once a customer selects a Maui-Jim-branded frame on Defendants' website, the customer is confronted with the following website display:



(*Id.* ¶ 51.)  The last sentence of the above states in relevant part that "SmartBuyGlasses is not affiliated with nor an official re-seller for Maui Jim and therefore we provide our own comprehensive 24 month warranty, as Maui Jim do not support their own 24 month warranty with us." (*Id.*)  But Defendants' Kalinko testified that he drafted that language after the litigation commenced. (*Id.* (citing Kalinko Dep. 500:13–504:2).) So, we cannot discern from the record how long this disclaimer was posted.

The parties also dispute whether statements on Defendants' website adequately informed consumers that they were purchasing third-party prescription lenses rather than Maui Jim lenses. (*Id.* 54–56.) As two examples:



(*Id.* ¶ 54), and



(*Id.* ¶ 55.) Suggesting that their customers would have viewed these disclaimers, Defendants note that their customers take their time when purchasing sunglasses on their website. (*Id.* ¶ 62.) For example, Defendants contend that their customers visit its website on average ███████ over a period of more than █ days before making a purchase. (*Id.* ¶ 64.)

Defendants also claim that they additionally sent customers who bought prescription Maui-Jim-branded sunglasses a separate envelope along with a lens card explaining that the lenses they received were third-party manufactured. (*Id.* ¶¶ 59, 65–69.)

Defendants' website contained the following world map portrayal suggests that Defendants had an "operation centre" in New York:



(Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶ 40.)  Although Defendants do not dispute that they do not have any physical location or physical office in New York, they contend that they do have an "operational dropship location in New York." (*Id.* ¶¶ 40–41.)

E.    **First Sales of Defendants' Maui-Jim-Branded Sunglasses**

Maui Jim claims that it never sold a single pair of Maui Jim sunglasses to Defendants. (*Id.* ¶ 32.)  Defendants dispute that, reasoning that Maui Jim sold its sunglasses to a company called "          with the full knowledge that these sunglasses would then be sold by SmartBuyGlasses online." (*Id.* ¶ 32.) We find that Defendants' response implicitly admits by omission that Maui Jim never *directly* sold a pair of its sunglasses to Defendants. (*See id.*)

Defendants additionally contend that they source their products through a network of suppliers, manufacturers, distributors, and authorized retailers. (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 1(d).)  But Maui Jim disputes that fact. (*Id.*) Although Defendants contend that they obtained their Maui-Jim-branded sunglasses from           or more companies (*id.* ¶ 37

(citing Ex. 49 (Dkt. Nos. 415–65)) Maui Jim claims that it never sold a single pair of its sunglasses to about half of those companies. (*Id.* ¶ 38.)[5]  More, Maui Jim claims that it only sold a total of █████ sunglasses to ten of the companies that Defendants claim gave them Maui-Jim-branded sunglasses, while Defendants claim that they received █████ pairs from those ten companies. (*Id.*)

A highlighted example is █████ the company that Defendants claim supplied them with most of their Maui-Jim-branded sunglasses. (*Id.*¶¶ 30–32.)  Defendants claim that █████ provided Defendants with █████ pairs of Maui Jim sunglasses (*id.* ¶ 32(d)) while Maui Jim states it sold far less to █████ (Pl.'s Mem. Lanham MSJ (Dkt. 427) at 12.)  Defendants' suppliers have submitted letters affirming the authenticity of the Maui-Jim-branded products they suppled to Defendants after this lawsuit was filed. (Pl.'s Resp. to Defs.' SOF (Dkt. No. 466) ¶ 18.) Related, SmartBuyGlasses CEO Doron Kalinko testified "No" to the question of whether he understood "that all of the Maui Jim-branded sunglasses that █████ was selling to SmartBuy came directly to █████ from Maui Jim." (Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) at 16.)  Thus, there is a material factual dispute over where the difference (potentially █████ pairs of sunglasses) came from.

Maui Jim conducted test purchases from Defendants to test the authenticity of Defendants' Maui-Jim-branded sunglasses between 2011 and 2016. (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶¶ 13, 81.)  Maui Jim Europe's Hans-Juergen Penzek testified that they also conducted test purchases from Defendants' European websites. (Pl.'s Resp. to Defs.' SOF (Dkt. 466) ¶ 13(a) (citing Penzek Dep. (Dkt. 466–7).)  Maui Jim's digital marketing

---

[5] Defendant's explanation for this factual dispute is, in part, that Maui Jim miscounted companies, like ███████████████████, that have slightly different names on the list than they do within Maui Jim's system.

manager Dave Siragusa testified that "beyond a visual inspection, I can't tell if those were or were not manufactured by Maui Jim." (Siragusa Dep. (Dkt. No. 466–3, 51:5–23).) Similarly, Maui Jim's Vice President of Purchasing Christopher McClain testified that he couldn't determine one way or the other when he was asked whether he could "say that any plano sunglasses that Maui Jim purchased from SmartBuyGlasses were not manufactured by Maui Jim." (McClain Dep. (Dkt. No. 415–24, 19:23–20:6).) Related, Maui Jim Vice President Jay Black testified that he was not aware of any evidence that Defendants were selling stolen merchandise, and that Maui Jim did not know whether Defendants ever sold damaged or stolen merchandise. (Pl.'s Resp. to Defs.' SOF (Dkt. No. 466) ¶ 12(b) (citing Black Dep. (Dkt. No. 466–2).) On this point, Maui Jim had a Rule 30(b)(6) witness testify that Maui Jim did receive at least one pair of damaged Maui-Jim-branded sunglasses from Defendants. (Pl.'s Resp. to Defs.' SOF (Dkt. No. 466) ¶ 12(b) (citing Siragusa Dep. (Dkt. 466–3).) But that deponent testified further that he does not know for certain whether Defendants' Maui-Jim-branded sunglasses are stolen because he could not determine from where Defendants sources their products. (*Id.*)

On at least two occasions, a Maui Jim customer service representative told a customer that Defendants' omission from Maui Jim's authorized retailers list does not automatically mean that Defendants' Maui-Jim-branded sunglasses are inauthentic. (Pl.'s Resp. to Defs.' SOF (Dkt. No. 466) ¶ 14.)

Thus, the parties dispute whether the Maui-Jim-branded sunglasses sold by Defendants were 100% genuine and authentic. And therefore, Maui Jim submits that none of the Maui-Jim-branded sunglasses sold by Defendants were once subject to an authorized first sale by Maui Jim.

## F.      Maui Jim's Statements About SmartBuyGlasses

Defendants claim that Dave Siragusa, Maui Jim's Digital Marketing Manager, instructed Maui Jim's customer service to inform customers that SmartBuyGlasses sold "stolen, used, damaged, gray market or counterfeit products through their site." (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 97 (citing Ex. 112 of Defs.' Amend. SOF).)  Maui Jim admits that Siragusa stated that any site not on Maui Jim's authorized retailer list *may be* selling used, counterfeit, broken or stolen products. (*Id.* ¶ 98.)  He also told Maui Jim customer service representatives to respond to customer inquiries about unauthorized retailers "that these sites are not listed and therefore are selling diverted, used, damaged or counterfeit goods and they void our 2 year warranty by purchasing on these sites." (*Id.* (citing Ex. 112 of Defs.' Amend. SOF).)

## G.      Maui Jim's Third-Party Contracts

On September 24, 2008, Maui Jim's employee, Michelle Munson, emailed VisionDirect.com.au, one of Defendants' websites, alleging that that website was tortuously interfering with Maui Jim's contracts by procuring Maui-Jim-branded sunglasses from Maui Jim's authorized accounts. (*Id.* ¶ 23.)  In that email, Munson demanded they cease doing so. (*Id.* ¶ 23.)  In response, Defendants' Co-Founder David Menning emailed Munson and stated that Defendants would remove the Maui Jim line from their website and requested follow up conversations to better understand the procedure behind becoming authorized distributor. (*Id.*)

Defendants claim that neither Maui Jim nor any of Maui Jim's authorized retailers ever informed Defendants of their contractual terms. (*Id.* ¶ 100.)  Maui Jim dispute that fact, contending that on March 8, 2008, Maui Jim wrote to Defendants and stated in part:

> By purchasing Maui Jim sunglasses from any authorized Maui Jim
> account, you are inducing that retailer to breach its contract with
> Maui Jim, which will subject you to civil liability for interference
> with a contractual relationship.

. . .

> Please cease and desist from attempting to procure Maui Jim products from any Maui Jim authorized accounts in the future. Such interference would likely result in those accounts being terminated and you will be liable for any damage suffered by Maui Jim as a consequence of such termination and diversion of our product.
>
> . . .
>
> Now that you are aware of Maui Jim's policy regarding its authorized retail accounts, you are on notice that future violations will constitute intentional interference with contractual relations.

(*Id.* (internal citation omitted).) Maui Jim echoed this message to Defendants on January 20, 2009. (*Id.*) Nevertheless, the parties disagree as to whether Defendants had knowledge of Maui Jim's contracts with third-party authorized retailers. (*See, e.g.*, *id.* ¶¶ 99–104.) Maui Jim contends that it has produced two of its contracts with its authorized retailers and that those contracts include the relevant anti-diversion clause. (*Id.* ¶ 102 (citing Dkt. No. 465).) Regarding alleged damages stemming from the claimed tortious interference with Maui Jim's third-party contracts, the parties dispute whether unpaid amounts owed to Maui Jim were incurred because of Defendants' conduct. (*Id.* ¶ 103.)

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Under Rule 56, the movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations

omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S. Ct. at 2510. In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2); *see also Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).

"On cross–motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56." *Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 125 F. Supp. 3d 810, 813 (N.D. Ill. 2015) (internal citations omitted); *see also Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013). As with any summary judgment motion, we consider cross–motions for summary judgment "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non–moving party." *Laskin*, 728 F.3d at 734 (internal citation omitted); *see also Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513. "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).

## ANALYSIS

### I.    Motion for Summary Judgment on Lanham Act and Related State Law Claims

#### A.    Trademark Infringement and Counterfeiting

We first[6] address Maui Jim's motion for summary judgment in its favor on its trademark infringement claim along with Defendants' related cross-motion. (Pl.'s Lanham MSJ (Dkt. No.

---

[6] We reject Defendants' laches defense for various reasons. For laches to apply, the defendant must show: (1) the plaintiff had knowledge of the defendant's use of an allegedly infringing mark; (2) the plaintiff inexcusably delayed taking action with respect to the defendant's use;

426); Defs.' MSJ).)  Maui Jim's basis for trademark infringement is brought under both Section

32 of the Lanham Act, 15 U.S.C. § 1114(1), and Section 43(a)(1) of the Lanham Act, 15 U.S.C.

§ 1125(a)(1).  Plaintiff must establish essentially two elements to prevail on its Lanham Act trademark

claims: (1) that it has a protectable trademark and (2) that Defendants' use of the trademark is likely to cause

confusion among consumers. 15 U.S.C. § 1114(1) and 1125(a)(1);

see also Entm't One UK Ltd. v. 2012Shiliang, 384 F. Supp. 3d 941, 948 (N.D. Ill. 2019) (citing Packman v.

Chicago Tribune Co., 267 F.3d 628, 638 n.8 (7th Cir. 2001)).

---

and  (3) the defendant would be prejudiced by allowing the plaintiff to assert its rights. *See*
*Chattanoga Mfg., Inc. v. Nike, Inc*., 301 F.3d 789, 792–93 (7th Cir. 2002).  Defendants' laches
defense is based on the premise that Maui Jim knew at least eight years before filing this lawsuit
that Defendants were selling Maui-Jim-branded sunglasses absent an authorized retailer
agreement.  We hold that Defendants have not shown that Maui Jim inexcusably delayed taking
action, nor that they would be prejudiced by allowing this lawsuit to go forward, nor that Maui
Jim acquiesced to their conduct for the following reasons.  For one, Maui Jim sent a cease and
desist letter concerning the core of this case's issue, and Defendants' Co-Founder David
Menning's response to that letter indicated a mutual understanding that his company would stop
their conduct. (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 23; Defs.' SOF Ex. 43 (Dkt.
No. 415–59) at 2–3.)  Maui Jim echoed its cease and desist letter again in 2009. (*See, e.g.*, Pl.'s
Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 76, 100 (citing Ex. 112 of Defs.' Amend. SOF).)
More, Maui Jim's CFO, Paul Lippens, testified that Maui Jim waited to sue Defendants until
their conduct had a significant impact on plaintiff's goodwill and business reputation. (Pl.'s
Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 77 (testifying to a culmination of Maui Jim's
awareness along with an increased number of related incidences and customer complaints).) *See*
*Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, No. 11-cv-02242, 2013 WL 6839815, at
*11 (N.D. Ill. Dec. 27, 2013) ("a trademark owner is not forced by the rule of laches to sue until
the likelihood of confusion caused by the accused use presents a significant danger to the
mark.").  Indeed, the record shows that Maui Jim's lawsuit was filed soon after Defendants' sales
and marketing of Maui-Jim-branded sunglasses rapidly increased. (*See* Pl.'s Resp. to Defs.'
Amend. SOF (Dkt. No. 466) ¶¶ 77–79 (illustrating Defendants' increase in sales and marketing
of Maui-Jim-branded sunglasses leading up to this lawsuit's filing).)  Nor have Defendants been
demonstrably prejudiced by any delay since their alleged infringing conduct continues post-filing
of this lawsuit, suggesting that they would have continued their conduct were the lawsuit filed
sooner.  Last, to the extent that Defendants contend that Maui Jim acquiesced to their conduct
through acts committed by certain Maui Jim Italy employees, the record is bereft of any facts
suggesting that they had Maui Jim's graces to do so, and any suggestion of acquiescence is
directly refuted by Maui Jim's cease and desist letters. (*Id.*  ¶¶  80– 81.)

## 1.    Protectable Trademarks

First, Maui Jim owns protectable trademarks.  Maui Jim's marks are registered with the U.S. Patent and Trademark Office on the Principal Register. (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶¶ 2–5.)  Such registry constitutes *prima facie* evidence of the validity of a plaintiff's registered trademarks and of a plaintiff's exclusive right to use the trademarks. 15 U.S.C. § 1057(b); *see also Entm't One*, 384 F. Supp. 3d at 948; *Monster Energy Co. v. Zheng Peng*, No. 17-cv-414, 2017 WL 4772769, at *4 (ND. Ill. 2017).  Accordingly, we find that there is no genuine issue of material fact that Maui Jim's trademarks are protectable.

## 2.    First Sale Doctrine

Before addressing likelihood of confusion, we address the first sale doctrine because Defendants contend it saves them from Maui Jim's trademark infringement case altogether.  The first sale doctrine is a defense to infringement subject to certain well-defined exceptions.  *Hart v. Amazon.com, Inc*., 191 F. Supp. 3d 809, 818 (N.D. Ill. 2016), *aff'd*, 845 F.3d 802 (7th Cir. 2017).  Under this doctrine, "when a retailer—such as Amazon—'merely resells a genuine, unaltered good under the trademark of the producer, the use of the producer's trademark by the reseller will not deceive or confuse the public as to the nature, qualities, and origin of the good.'" *Id.*  Rather, "the consumer gets exactly what the consumer bargains for, the genuine product of the particular producer." *Id.* (quoting *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995)).  Thus, resale by the first purchaser of the original article under the producer's trademark is generally neither infringement nor unfair competition. *See id.*; *see also Enesco Corp. v. K's Merch. Mart*, No. 99-CV-1070, 2000 WL 1800640, at *12 (N.D. Ill. Aug. 29, 2000); *Brode v. Tax Mgmt., Inc*., No. 88 C 10698, 1990 WL 25691, at *4 (N.D. Ill. Feb. 1, 1990).

Defendants believe Maui Jim exhausted its right to control distribution of its sunglasses when it sold them to other retailers. Maui Jim posits three reasons why it believes this defense fails. First, Maui Jim contends that Defendants cannot show that ██ of Maui-Jim-branded sunglasses Defendants sold were subjected to an authorized first sale. (Pl.'s Supp. Mem. (Dkt. No. 496) at 8.) Second, Maui Jim contends that Defendants' Maui-Jim-branded sunglasses are materially different from the ones that Maui Jim sells. Third, Maui Jim argues that Defendants go beyond the boundaries of the first sale doctrine because they mislead customers into believing that they are associated with Maui Jim. (Pl.'s Mem. Lanham MSJ (Dkt. 427) at 26.)

**a.        First Sale Doctrine: Authorized First Sales**

Maui Jim contends that Defendants' first sale doctrine defense fails because they cannot show an authorized first sale of the Maui-Jim-branded sunglasses they sold. Trademarked goods are not considered genuine goods until the trademark owner first authorizes the sale of those goods. *See, e.g.*, *Delta Air Lines, Inc. v. TDM Investments, LLC*, No. 18-cv-968, 2018 WL 3819108, at *2 (N.D. Ill. August 10, 2018) (citing *Hart*, 191 F. Supp. 3d at 817–18 (N.D. Ill. 2016); *RFA Brands, LLC v. Beauvais*, No. 13-14615, 2014 WL 7780975, at *7 (E.D. Mich. Dec. 23, 2014), *report and recommendation adopted*, No. 13-14615, 2015 WL 519166 (E.D. Mich. Feb. 9, 2015); *Ryan v. Volpone Stamp. Co*., 107 F. Supp. 2d 369 (S.D.N.Y. 2000)); *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc*., 979 F. Supp. 224, 230 (S.D.N.Y. 1997) ("The question of whether a good is genuine, however, presupposes the initial sale was authorized."); Restatement (Third) of Unfair Competition § 24 (1995) ("Trademarked goods produced by a manufacturer under a contract with the trademark owner should not be considered genuine goods until sale of the goods under the mark has been authorized by the trademark owner.")

We begin our analysis by addressing the applicable burden. The parties disagree over who shares the burden of proving whether an authorized first sale occurred. Maui Jim says that the Defendant bears the burden arguing that it is an affirmative defense[7]; Defendants say that Maui Jim bears the burden as part of its infringement case in chief. The parties cite neither binding case law nor a case within this district on this point. Nor were we able to find one.[8] The Ninth Circuit persuasively addressed the burden of proof applicable to the first sale defense in a 2015 copyright infringement opinion. *See Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1079 (9th Cir. 2015). *Adobe* held that the party asserting the first sale defense bears the initial burden of satisfying its requirements. *Id.* This means that the party asserting the first sale defense had the burden to "show ownership through lawful acquisition." *Id.*[9] We think that *Adobe*'s reasoning makes sense because it accords with the general notion that fairness dictates that a

---

[7] Defendants asserted the first sale doctrine as an affirmative defense in their Answer. (Answer (Dkt. No. 259) at 31–32.) Curiously, Defendants' legal position flipped to the opposite in their supplemental briefing on this issue. (Defs.' Supp. Mem. (Dkt. No. 499) at 2–3.)

[8] The Supreme Court last scrutinized the first sale doctrine in 2013 without discussing burdens. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 528, 133 S. Ct. 1351, 1357 (2013). In *Kirtsaeng*, the Supreme Court held that the first sale doctrine applies to copies of works made and sold abroad. *Id.* Central to that decision was the fact that the first sale doctrine has its roots in common law principles that made no geographical distinction. *Id.*

[9] *Adobe* further explained:

> What does this mean in practical terms? In the context of a summary judgment motion in a software case, it simply means that the party asserting a first sale defense must come forward with evidence sufficient for a jury to find lawful acquisition of title, through purchase or otherwise, to genuine copies of the copyrighted software. To the extent that the copyright holder claims that the alleged infringer could not acquire title or ownership because the software was never sold, only licensed, the burden shifts back to the copyright holder to establish such a license or the absence of a sale.

*Id.*

litigant ought not have the burden of proof on facts particularly within the knowledge of the opposing party. *See United States v. N.Y., New Haven & Hartford R.R. Co*., 355 U.S. 253, 256 n. 5, 78 S. Ct. 212, 214 n. 5 (1957) ("The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary."); *see also* 2 McCormick on Evid. § 337 (7th ed.) (2013) ("A doctrine often repeated by the courts is that where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party has the burden of proving the issue."). Here, Defendants are best suited to know who gave them the Maui-Jim-branded sunglasses they sell on their website. We think it would be absurd to think that fairness would otherwise dictate that an IP holder should be required to prove from where a potential infringer obtained their property to overcome the first sale doctrine. That type of information is not within a trademark holder's knowledge. Pragmatically, holding otherwise would require trademark holders to employ mechanisms outside of the Lanham Act's purview to track their trademarked products' sales throughout the stream of commerce when a reseller could have just revealed their source. Thus, fairness leads us to follow *Adobe*'s holding and so we place the burden on Defendants – the parties asserting the first sale affirmative defense – to show how they obtained ownership of the Maui-Jim-branded sunglasses that they sold.

With an understanding of the applicable burden, we briefly review other first sale doctrine cases. In *RFA Brands*, for example, the defendant claimed that he obtained certain goods through a one-time purchase of auctioned storage units and believed the first sale defense applied to protect his later sales on Amazon.com. *RFA Brands*, 2014 WL 7780975 at *8. *RFA Brands* held that even if the defendant did find the plaintiffs' products in the storage units that he bought, the defendant at best could only speculate as to the origin of such products. *Id.* So, *RFA Brands* held that the "defendant ha[d] not established that the first sales of the products at issue

were 'authorized'" and held that the plaintiffs were entitled to summary judgment on their trademark infringement claim. *Id.* Indeed, *RFA Brands* held that those goods were no longer genuine goods since there was no proof of an authorized first sale by the trademark owner. *Id.* *RFA Brands* went on to grant summary judgment for the plaintiff-IP holders. *Id.*

*RFA Brands* followed the analytical process set out by other courts. For example, in *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 620 (E.D. Tenn. 2012), the defendants purchased certain goods through eBay and were "unsure where the parts came from or where they were produced before they arrived in their possession." *Id.* That court went on to hold that since those defendants could only speculate that the goods were produced by Ford and purchased within Ford's supply chain that there was a "risk of injury to the reputation of [Ford's] mark." *Id.* at 626–27 (internal citation omitted.); *see also Green v. Electric Vacuum Cleaner Co.*, 132 F.2d 312, 314 (6th Cir. 1942) (holding that an alleged infringer does not enjoy the first sale doctrine's protection by merely asserting "that the articles are legitimate and, without disclosing their source, were purchased from those who bought from the plaintiff.").

Here, Maui Jim argues that Defendants offer less than *RFA Brands*' insufficient speculation because they "deliberately stayed ignorant of the source of the MAUI JIM-branded sunglasses that it purchase[d] from third parties, half of whom have never been Maui Jim authorized retailers." ((Pl.'s Mem. Lanham MSJ (Dkt. 427) at 27.) Related, Maui Jim argues that Defendants are unable to prove that ███████████ of pairs of Maui-Jim-branded sunglasses they sold stem from an initial authorized sale. This argument is based on the following purchasing scheme laid out by Maui Jim:

> Maui Jim has never sold a single pair of MAUI JIM sunglasses to [Defendants]. Because [Defendants] cannot get MAUI JIM sunglasses *from* Maui Jim, [Defendants] ha[ve] chartered a secretive path *around* Maui Jim. [Defendants] contend[ ] that it gets the

sunglasses through ▉ distributors and affiliates that purchase directly from Maui Jim. Maui Jim, however, has never sold a single pair of MAUI JIM sunglasses to ▉ of the companies. Therefore, the MAUI JIM-branded sunglasses that those companies sold to [Defendants] could not have come to those companies "directly from Maui Jim."

The remaining ▉ companies were once authorized retailers of Maui Jim, but Maui Jim sold only ▉ pairs of MAUI JIM sunglasses to those companies. Those companies necessarily obtained the other ▉ pairs from one or more sources other than Maui Jim. And [Defendants] admit[ ] that [they] neither know[ ] the sources nor care[ ] to know, for fear of being invested with uncomfortable facts."

(Pl.'s Mem. Lanham MSJ (Dkt. 427) at 25.)[10]

Defendants have not shown authorized first sales for each of its Maui-Jim-branded sunglasses beyond blanketed self-serving testimony and testimony from third-parties. (*See, e.g.*, Defs.' Supp. Mem. (Dkt. No. 499) at 5–6 (collecting citations to the record).) Such blanket testimony does not convince us that no question of material fact exists such that we may rule for Defendants at the summary judgment stage. *See Green*, 132 F.2d at 314 (holding that an alleged infringer does not enjoy the first sale doctrine's protection by merely asserting "that the articles are legitimate and, without disclosing their source, were purchased from those who bought from the plaintiff."). The non-blanketed evidence fairs no better. For example, Defendants claim that a vast majority of their sunglasses (more than ▉ sunglasses) were sold by Maui Jim to a company called ▉ (Dkt. Nos. 462 at 3, 458 at 7–8, 466 32(d).) And Defendants further claim that Maui Jim's own sales representatives knew that ▉ would turn around and sell those sunglasses to Defendants to be resold. (Defs.' Resp. to Pl.'s SOF Pl.'s MSJ (Dkt. No. 459 ¶ 32.) In fact, there is a dispute between Maui Jim's records show that it sold ▉ pairs of sunglasses to ▉ and Defendants' contention that they obtained more than ▉ pairs from

---

[10] Defendants state that it is actually ▉ total suppliers rather than ▉ and that the ▉ tally was the result of an administrative error. (Dkt. No. 458 at 7.)

24

███ (*See, e.g.*, Pl.'s Mem. Lanham MSJ (Dkt. 427) at 12.) Defendants' chief support for this factual claim relies on the declaration submitted by ████ managing director, ████████ ████████ testimony effectively states that Maui Jim sold some sunglasses to ████ knowing that it would then sell those sunglasses to SmartBuyGlasses. We are unable to know whether a jury would view ████████ testimony to mean that the unaccounted-for sunglasses were routed to Defendants after an authorized first sale. (*See, e.g.*, Defs.' Opp. Mem. (Dkt. No. 458 at 7).) Moreover, besides ████ there remains ████ of other sunglasses procured from other sources that lack specific sourcing information. (*See id.*; *see also* (Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 38)). Therefore, we hold that Defendants have failed to overcome their burden with respect to the first sale doctrine at this juncture. Nevertheless, we decline to grant summary judgment on this defense in Maui Jim's favor because Defendants have provided enough source evidence to create a question of material fact as to whether they meet their burden under the first sale doctrine such that judgment as a matter of law would be inappropriate.

For these reasons, we find a genuine issue of material fact exists such that judgment as a matter of law on the first sale doctrine issue would be inappropriate at the summary judgment stage.[11]

### b.      First Sale Doctrine: Material Differences

The first sale doctrine does not apply to products that have been materially altered from their original form. *See, e.g.*, *Delta Air Lines, Inc.*, 2018 WL 3819108 at *2 (citing *SoftMan Prods. Co., LLC v. Adobe Sys., Inc.*, 171 F. Supp. 2d 1075, 1093 (C.D. Cal. 2001)); *Rockwell*

---

[11] Our conclusion would be the same had the burden been Maui Jim's to bear. Had the burden been Maui Jim's, we would have held that they did enough to convince us that a question of material fact existed as to whether an authorized first sale occurred such that judgment as a matter of law would be rendered inappropriate.

*Automation, Inc. v. Radwell Int'l, Inc.*, No. CV 15-05246 (RBK/JS), 2019 WL 7288946, at *3 (D.N.J. Dec. 30, 2019) ("The 'material differences' doctrine, which is judge-made law, has been an exception to the doctrine that the first sale of a good covered by IP exhausts the IP owner rights in the good.") It is incumbent upon the reseller to show that the differences are not of the kind that consumers would likely consider in purchasing the product. *Hyundai Const. Equip. U.S.A., Inc. v. Chris Johnson Equip., Inc.*, No. 06-cv-3236, 2008 WL 4210785 (N.D. Ill. Sept. 10, 2008). An alteration is material if it changes something about a product that is relevant to consumers' decision to purchase the product. *Id.* (collecting cases).

Maui Jim believes that its branded sunglasses are materially different from those sold by Defendants in several ways. First, Maui Jim contends that Defendants' Maui-Jim-branded sunglasses customers experience inordinate delays. Second, Maui Jim argues that Defendants' sales do not qualify for Maui Jim's warranty program. Third, Maui Jim reasons that "someone who bought MAUI JIM-branded sunglasses from [Defendants] may have received MAUI JIM-branded sunglasses that differed from genuine MAUI JIM sunglasses" because Defendants "sold MAUI JIM-branded sunglasses after removing the original lenses and mounting in the frames prescription lenses that did not come from Maui Jim" but rather were "manufactured using a process over which Maui Jim had no control." (Pl.'s Lanham MSJ at 32; *see also* SOF ¶ 34.). We discuss these three categories of potentially material differences in turn.

### i.     Material Difference: Shipping Delays

Maui Jim first contends that the first sale doctrine does not save Defendants due to a material difference in shipping speeds and delivery reliability. (Pl.'s Mem. Lanham MSJ (Dkt. No. 427) at 28.) Maui Jim does not cite any case law where a court held that inordinate shipping delays were a material difference. But Maui Jim does direct us to *Bel Canto Design, Ltd. v. MSS*

*HiFi, Inc.*, 837 F. Supp. 2d 208, 224 (E.D.N.Y. 2011) and *Beltronics USA, Inc. v. Midwest Inventory Distrib. LLC*, 522 F. Supp. 2d 1318, 1327 (D. Kan. 2007), *aff'd* 562 F.3d 1067, 1071 (10th Cir. 2009). *Beltronics* and *Belcanto* stand for the proposition that "a physically identical product is nevertheless 'materially different' from the genuine article if 'the bundle of services' that attach to that genuine article is not available to the consumer." *Bel Canto*, 837 F. Supp. 2d at 224 (citing *Beltronics*, 562 F. Supp. at 1071).

In *Beltronics,* the defendant manufactured automobile radar detectors and sold them through authorized dealers who agreed to minimum price restrictions. *Beltronics*, 522 F. Supp. 2d at 1327, *aff'd* 562 F.3d at 1071. However, as alleged in this case, the authorized dealers violated their dealership agreements by reselling to an unauthorized retailer, the defendant. That defendant in turn sold Beltronics' products on eBay as "new" Beltronics products. The *Beltronics* defendant altered the product merely be masking the serial number on the products to make unknown the identity of the authorized dealer that supplied them with the radar detector. But Beltronics' policy was that consumers could only receive certain services like software upgrades, rebates, product use information, service assistance, warranties, and recall information if their radar detector had an original serial number. The Tenth Circuit found the altering of serial numbers voided the product's warranty under Beltronics' policy and so the radar detectors the defendant sold were materially different from genuine Beltronics radar detectors. *Id.* *Bel Canto* followed *Beltronics* and analogously involved alteration of serial numbers. *Bel Canto*, 837 F. Supp. 2d 208. *Bel Canto* held that the defendants' products lacked warranty and other services such as upgrades and recall notices did not constitute a material difference. *Id.* *Bel Canto*'s reasoning was premised in the fact that Bel Canto was a New York dealer governed by a New York law that prohibited attempts to limit warranties to direct purchasers only. *Id.* at 226

(citing GBL 369-b of the New York General Business Law). Neither *Bel Canto nor Beltronics* directly discuss delivery speeds. *Id*; *see also Beltronics*, 522 F. Supp. 2d at 1327, *aff'd* 562 F.3d at 1071.

Here, although the record contains disputed evidence of customer complaints about Defendants' slow and delayed shipments (Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶ 61), we are unaware of any case law establishing that poor customer service respecting shipment speeds constitutes a "material difference." And shipment speeds are distinguishable from the warranties discussed in *Belcanto* and *Beltronics*, so we refuse to combine the two. We think a holding that different shipping speeds constitute a material difference would be inappropriate since customers should know that shipment speeds are based on the retailer/website from which they purchase their product and are wholly unrelated to the product's brand. Accordingly, we hold that the difference in shipping speeds between Maui Jim's website's sales and Defendants' website's sales is not a material difference barring Defendants' first doctrine defense.

### ii.     Material Difference: Warranty Program

Maui Jim next contends that differences between Maui Jim's warranty and Defendants' is a material difference that overcomes Defendants' first sale doctrine defense. The analysis into the warranty programs invites two inquiries: (1) whether Maui Jim's warranty extends to a pair of authentic glasses sold by someone other than an authorized vendor like Defendants and, if not, (2) whether Maui Jim's warranty is materially different from Defendants'.

Maui Jim's position is that its warranty "does not apply to sunglasses purchased outside its network of authorized retailers." (Pl.'s Mem. Lanham MSJ (Dkt. No. 427) at 31.) Defendants counter that Maui Jim's "own communications with customers belie that contention." (Defs.'

Mem. Opp. to Pl.'s Lanham MSJ (Dkt. No. 458) (citing Dkt. No. 488)); *see, e.g.*, Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶¶ 28, 63.)

First, Defendants argue that Maui Jim's head of Customer Care, Lynn Campen, specifically advised a customer service representative to tell a customer that Maui Jim would repair and replace a customer's sunglasses as long as they are authentic. (Defs.' SOAF Opp. Pl.'s Lanham MSJ ¶ 28 (Dkt. No. 488).)  The record shows in this instance that a customer emailed Maui Jim asking whether Maui Jim's warranty applied to retailers who are "not authorized." (Defs.' SOAF Opp. Pl.'s MSJ ¶ 28, Ex. S (Dkt. 463–19).)  The pertinent customer service representative then asked Campen for advice. (*Id.*)  Campen emailed the customer service representative advising her to tell the customer "If your sunglasses are authentic Maui Jim Sunglasses we would offer repair and replacement options as long as parts are available." (*Id.*). Defendants' inference, that Maui Jim would repair all sunglasses under their warranty bears no relationship to this quoted language.  Indeed, Campen's internal email simply did not indicate that the repair would be made pursuant to a *warranty*. (*Id.*)

SOAF ¶ 29 echoes ¶ 28.  There, a customer asked whether Maui Jim's customer service representative whether they will "do repairs" "even if I get one of ur [sic] glasses from" an unauthorized dealer like Amazon. (Dkt. No. 463–20, Ex. T at 2.)  That customer did not ask about Maui Jim's warranty, as Defendants would like us to infer. (*Id.*) The customer service representative there answered in part, "Yes, we will still *offer* repair services on authentic Maui Jim sunglasses, even if they are purchased from an unauthorized retailer." (*Id.* (emphasis added).)  The fact that Maui Jim will repair sunglasses is different than whether Maui Jim's warranty would apply.  The real question is, would this customer need to *pay* for repairs.

In summary, although Defendants say the emails contained at SOAF ¶¶ 28 and 29 mean that Maui Jim's warranty would cover Maui Jims purchased from unauthorized dealers, the record does not support that alleged fact. For one, Defendants' reading differs from the plain language used in the emails that state only that Maui Jim would merely *offer* certain services. (*see, e.g.*, *id.*) More, Lynn Campen later clarified this policy in her testimony. (Pl.'s Resp. to Defs.' SOAF Opp. Pl.'s MSJ, Ex. 73 (Dkt. No. 488–13) at 3.) She testified that "We don't offer repair service under warranty from an unauthorized reseller." (*Id.*). Campen further testified that any such "repair and replacement options" she referenced in an internal email "would be at a charge." (*Id.* at 170-:4–171:1.) Campen's testimony is corroborated by customer feedback organized in Maui Jim's "Warranty Chart." (*See, e.g.*, Dkt. No. 428, Ex. 30, Statement No. 156.). There, for example, a customer complained that he bought Maui-Jim-branded sunglasses from SmartBuyGlasses, eventually sent them in to Maui Jim for a repair, and then "found out that they could not repair under warranty since SmartBuy was not a autherrized [sic] store . . . So [I] had to pay for repair which would almost cost more tha[n] new." (*Id.*) Thus, there is no question of material fact in the record that Maui Jim's warranty does not apply to Maui-Jim-branded sunglasses obtained from an unauthorized retailer like Defendants.

We next address whether Maui Jim's warranty is materially different from Defendants' warranty. "[A]bsence of or a different warranty has been held to be a material difference." *Hyundai v. Johnson*, No. 06-3238, 2008 WL 4210785 at *2 (N.D. Ill. 2008) (citing *Bourdeau Bros., Inc. v. International Trade Com'n*, 444 F.3d 1317, 1325 n. 3 (Fed. Cir., 2006)); *Beltronics*, 562 F. Supp. at 1071 (holding that warranties fall within the bundle of services that may yield material differences).

The *Hyundai* defendant contended that his customers knew what they were purchasing: a Hyundai product without any warranty. *Id.* at *2–3. The customers deposed in *Hyundai* agreed with the defendant's view that they knew they were purchasing a Hyundai product without any warranty. *Id.* at *2. Still, the court granted summary judgment against the defendant reasoning that "While it may have been [his] intention to warn all of his customers . . . this would not protect subsequent customers who may purchase the equipment from [his] customers." *Id.* *Hyundai* continued, "Thus, the record here conclusively establishes that there are material differences between the equipment [he] imported and the equipment distributed by Hyundai in the United States and Canada." *Id.*

Indeed, it is undisputed that the parties have received inquiries from both present and potential customers about their respective warranty coverages. (Defs.' Resp. to Pl.'s SOF (Dkt. 459) ¶ 62, Ex. 30 (Dkt. 428–25).) Yet the parties dispute whether their respective warranties are identical. (Defs.' Resp. to Pl.'s SOF (Dkt. 459) ¶ 63.) Defendants contend that SmartBuyGlasses' warranty provides identical or better coverage. (*Id.*; Defs.' Mem. Opp to Pl.'s MSJ (Dkt. 458) at 14.) To demonstrate this, Defendants compare, among other things, Maui Jim's 24-month replace/repair policy and Defendants' 24-month replacement warrant against manufacturer's defects. (Defs.' Resp. to Pl.'s SOF (Dkt. 459) at 14.) But we observe three potential differences in the parties' warranty coverages based on the record: (1) Maui Jim's warranty offers *repair* in addition to replacement, while SmartBuyGlasses' does not; (2) Maui Jim's warranty is tracked from the date the customer receives the product, whereas SmartBuyGlasses' tracks it from the order date, meaning that Maui Jim's is longer (without even accounting for SmartBuyGlasses' alleged slower shipping speeds); and (3) both warranties only

cover *manufacturer's defects*, so Maui Jim, as manufacturer, is logically better suited to determine whether an issue is a manufacturer's defect or not.

Differences in warranties must influence a customer's purchasing decision to overcome the first sale doctrine. *See Hyundai Const. Equip. U.S.A., Inc*., 2008 WL 4210785 at *2 (internal citation omitted). It is incumbent upon the re-seller to show that the differences are not of the kind that consumers would likely consider in purchasing the product. *See id*. Here, there is a question of material fact as to whether differences in Maui Jim and Defendants' warranties influence a customer's purchasing decision. ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████n. More, the record contains evidence suggesting that Maui Jim's warranty does influence consumers' purchasing decision as highlighted in consumer complaints and consumer inquiries directed to both Maui Jim and SmartBuyGlasses.[12] More, the fact that warranties and repair services were ranked ███ in consumer priorities when choosing premium sunglasses could support a finding that Maui Jim's warranty is a material part of a consumer's purchasing

---

[12] We additionally think that a jury could find that the difference in warranty provider alone could warrant a material difference even if the warranties' terms were identical. For example, we conjecture that a warranty from an institutional manufacturer would certainly be perceived more valuable to a consumer than the same warranty term provided by a discount retailer. We think that that could make sense under the appropriate circumstances, but the parties do not address whether consumers would be more likely to trust an institutional manufacturer's warranty fulfillment promise more than a lesser known discount vendor's.

decision, especially given Defendants do not offer repair services.[13]  Therefore, we hold that the question of whether Maui Jim's warrant is materially different from Defendants' remains a question of material fact such that judgment as a matter of law is inappropriate at this juncture.

### iii.    Material Difference: Quality Control

Third, Maui Jim argues that even if Defendants' Maui-Jim-branded sunglasses were once authentic, the lack of Maui Jim's ability to control quality of the sunglasses once they arrived in Defendants' hands constitutes a material difference. (Pl.'s Lanham MSJ (Dkt. 427) at 32; Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶ 34.)  Legitimate quality control measures can constitute a material difference in appropriate circumstances. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 304 (3d Cir. 1998).  Quality control measures may create subtle differences in quality that are difficult to measure but important to consumers. *Id.*  So, courts do not require trademark owners show that the actual quality of the inspected goods is measurably higher than that of the uninspected goods. *Id.* (collecting cases).  At the same time, 'quality control' is not a talisman the mere utterance of which entitles the trademark owner to judgment. *Id.* (internal citation omitted).  Rather, the test is whether the quality control procedures established by the trademark owner are likely to result in differences between the products such that consumer confusion regarding the sponsorship of the products could injure the trademark owner's goodwill. *Id.* (citing *Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996) (trademark holder must show that it uses substantial and nonpretextual quality control procedures such that nonconforming sales will diminish the value of the mark)); *see also R.J. Reynolds Tobacco Co.*

---

[13] Campen testified that Maui Jim's repair department received on average three to four nonprescription lenses per week for repair services between 2015 and 2018. (Pl.'s Resp. to Defs.' SOF (Dkt. 466) ¶ 70(f).)  The jury is best positioned to determine how that frequency of repair requests reflects on the materiality of the repair service.

*v. Premium Tobacco Stores Inc.*, No. 99 C 1174, 2000 WL 1923332, at *3 (N.D. Ill. Nov. 15, 2000) (collecting cases). Thus, Maui Jim must demonstrate that its quality control procedures create a likelihood that their sunglasses are different from those that it does not control. *Id.* (internal citation omitted). In so demonstrating, Maui Jim need not show that its procedures succeed in preventing virtually all substandard product from reaching the consumer. *Id.* It is enough that it stops purchases of substandard product to create a material difference between the categories of authorized and unauthorized sales. *Id.* (citing *Iberia*, 150 F.3d at 305 (cursory and standardless search for "obvious defects" insufficient to create material difference)). True, Defendants admit that it sold a small amount (█ pairs) of Maui Jim sunglasses with third-party prescription lenses outside of Maui Jim's control (Defs.' Opp. Mem. (Dkt. 458) at 15) but we are otherwise unable to ascertain based on the record how Maui Jim's other talisman of 'quality control' is enough to allow us to resolve this issue at the summary judgment stage.

Concluding the inquiry into material differences, we hold that there remains questions of material fact that preclude judgment as a matter of law.

### c.     First Sale Doctrine: Sponsorship

Maui Jim contends that the first sale doctrine's "sponsorship exception" also blocks Defendants from the first sale doctrine defense. (Pl.'s Mem. Lanham MSJ (Dkt. 427) at 32.) Under the sponsorship exception, the first sale doctrine's protections do not extend to resellers who use other entities' trademarks to give the false impression that they are favored or authorized dealers for a product. *Delta*, 2018 WL 3819108 at 2 (citing *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006); *D 56, Inc. v. Berry's Inc*., 955 F. Supp. 908, 910–20 (N.D. Ill. 1997). Thus, use of a plaintiff's trademark in promotional materials such as advertising or displays is not protected by the first sale doctrine, but use of a plaintiff's trademark solely to

identify a product up for sale is protected. *Id.* The sponsorship exception is a relevant inquiry because "one who resells trademark goods is obligated to do so in a manner that is not likely to cause confusion or imply that the seller is associated with the manufacturer." *Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc*., No. 01-cv-585, 2001 WL 128164, at *2 (N.D. Ill. Feb. 9, 2001) (quoting *Quill Corp. v. Nada Scientific Ltd.*, No. 97-cv-7461, 1998 WL 295502 (N.D. Ill. May 21, 1998)). This means that conduct that goes beyond the mere resale of trademarked goods and its incidental advertising may not be protected by the first sale doctrine. *See, e.g.*, *Enesco Corp. v. K's Merchandise Mart Inc.*, No. 99-cv-1070, 2000 WL 1800640 (N.D. Ill. Aug. 29, 2000) (Pallmeyer, J.) (collecting cases); *D56, Inc.* 955 F. Supp. at 919 (acts such as the use of the producer's trademark on displays and in advertising, and the distribution of the producer's promotional literature constituted conduct that went beyond mere resale and its incidental advertising).

Maui Jim claims that Defendants misled consumers that they were an authorized retailer of Maui Jim sunglasses. Indeed, it is undisputed that Defendants were never part of Maui Jim's authorized retailer program. (Defs.' Resp. to Pl.'s SOF (Dkt. 459) ¶ 64.) Maui Jim chiefly takes issue towards SmartBuyGlasses.com's representation that it works directly with leading eyewear manufacturers and suppliers. (Pl.'s Mem. Lanham MSJ (Dkt. No. 427) at 33.) As an example, the parties do not dispute that SmartBuyGlasses.com previously contained a diagram that advertises that SmartBuyGlasses.com's supply chain is direct from the manufacturer to the customer. (Pl.'s Lanham SOF ¶ 68, Ex. No. 35 (Dkt. No. 428-40). That diagram additionally shows that SmartBuyGlasses.com's supply chain does not include intermediaries like exporters, importers, wholesalers, and retail shops. (*Id.*) Maui Jim reasons that that representation is misleading because it is also a leading eyewear manufacturer, does not associate with

SmartBuyGlasses.com, yet SmartBuyGlasses.com nevertheless retails its product. (*Id.*at 33–34.) So, Maui Jim contends that that diagram falsely suggests that sunglasses purportedly bearing Maui Jim's brand on SmartBuyGlasses.com would be sourced directly from Maui Jim, the manufacturer. To that point, even SmartBuyGlasses' Vice President, Mr. Rossetto, testified that this diagram was a poor representation of SmartBuyGlasses' procurement model. (Pl.'s Resp. to Defs.' SOAF (Dkt. No. 488) ¶ 15.)

Maui Jim submitted ██ instances where Defendants' customer service representatives supposedly indicated that they were an authorized Maui Jim dealer. (Pl.'s Lanham SOF ¶ 65, Ex. No. 26 (Dkt. No. 428).) One example is highlighted in their brief. (Pl.'s Lanham MSJ Mem. (Dkt. 427) at 33.). That example shows a customer asking SmartBuyGlasses' customer service representative: "Are you an authorized Maui Jim's dealer?" (Pl.'s Lanham SOF ¶ 65, Ex. No. 26-60 (Dkt. No. 428-28) and its customer service representative responding: "Yes, we are." (*Id.*). Other customer feedback echoes Maui Jim's concern. For example, Maui Jim points to customer feedback organized in a chart where a SmartBuyGlasses representative stated "all our products are 100% authentic[ ] [w]e source the authentic items through authorized distributors." (Pl.'s Lanham SOF 65, Ex. 32, No. 148 (Dkt. No. 428–37 at 12).) That statement was in response to the following Customer's message: "your section 'Authenticity' says you work directly with the manufacturers, in this case Maui Jim, so why is it that they don't know where you get your MJ sunglasses from. Sh [sic] also told me that they could be counterfeit." (*Id.*) Maui Jim also cites to the example of a SmartBuyGlasses customer who asked its customer service representative how it can "guarantee authenticity when [its] not an authorized dealer of Maui Jim products?" (*Id.* at 7–98 (Dkt. No. 428–37 at 8.) To which SmartBuyGlasses' customer service representative responded by stating that it "source[s] it from the manufacturer itself." (*Id.*) That customer

responded by telling the representative that Maui Jim had told that customer that they "aren't supplying you guys with glasses," and then the representative changed course and stated "we do not source the item from Maui Jim brand, we source it from the factory or manufacturer on where they also ordered their items." (*Id.*)[14] Defendants downplay these statements as merely mistakes made by customer service representatives rather than depictions of customer confusion.

Maui Jim also argues impermissible sponsorship on the basis that Defendants "fraudulently uses Maui Jim's 2009 Drop Ball Certification, without Maui Jim's knowledge or authorization, to mislead Customs into believing that Maui Jim guaranteed that whatever SBG was shipping to U.S. customers had been tested for impact resistance." (Pl.'s Mem. Lanham MSJ (Dkt. 427) at 35) (citing Pl.'s Lanham SOF ¶ 43); Pl.'s Lanham SOF ¶ 43, Ex. 8 (Dkt. 428–8 at 2.) Exhibit 8 is a one-page document entitled "Drop Ball Test Certification" that states:

> I, Rebecca Myers, hereby guarantee that the articles listed herein are impact resistant within the meaning of 21 CFR 801.410 and have been tested pursuant to that section. Impact resistant lenses are not unbreakable or shatterproof. Record of testing will be maintained for a period of three (3) years from the date of shipment and copies will be furnished to the FDA upon request.
>
> Company Name: Maui Jim
> Name: Rebecca Meyers
> Title: Logistics Manager
> Date: 6/8/09

(Pl.'s Lanham SOF ¶ 43, Ex. 8 (Dkt. No. 428–8) at 2.) The certification includes Maui Jim's trademark on the top left of the certification page. (*Id.*) Defendants' attempt to downplay this by drawing a distinction between misleading consumers versus misleading U.S. Customs. (*Id.* at

---

[14] Defendants dispute that any of the examples references within Maui Jim's Ex. 32 to its Statement of Facts reflects actual customer confusion from SmartBuyGlasses' statements and actions. (Defs.' Resp. to Pl.'s SOF ¶ 65 (Dkt. No. 459 at 23.)

18.)  We find that difference unremarkable especially where Defendants admit that at least two consumers received this incorrect Drop Ball Test Certification paperwork. (*Id.* at 17–18.)

Defendants reason that the sponsorship exception does not overcome the first sale doctrine defense due to their website's disclaimers.  First, Defendants state that its website has disclaimers stating that SmartBuyGlasses is not owned by or affiliated with any brand it sells unless expressly stated otherwise. (Defs.' Mem. Opp. to Pl.'s Lanham MSJ (Dkt. No. 458) at 16 (citing its SOF (Dkt. No. 446) ¶ 48).). Maui Jim does not dispute that that disclaimer appears in small type on the bottom of SmartBuyGlasses.com. (Pl.'s Resp. to Defs.' Amend. SOF Defs.' MSJ (Dkt. 466 ¶ 48.).   Second, Defendants argue that its website advises customers that "SmartBuyGlasses is not affiliated with nor an official re-seller for Maui Jim" when a customer views a Maui Jim specific model on its website. (*Id.* at 16 (citing their SOF ¶ 51.) SmartBuyGlasses may have confused customers with its contradictory statements throughout its website that it is authorized by "all" brands rather than a more accurate word like "most" or "many" brands.

Last, Maui Jim's Sowers Expert Survey suggests that certain disclaimers misled 40% of the survey respondents to incorrectly think that SmartBuyGlasses was an authorized retailer of Maui-Jim-branded sunglasses. (ECF 418, Ex. 1 ¶ 12.)  But that could also reasonably suggest that the other 60% of the survey respondents did not perceive any degree of sponsorship.

We cannot say that no question of material fact exists with respect to sponsorship when considering these disclaimers' existence alongside the other evidence in the record. Accordingly, the sponsorship question presented here contains far too many disputed material facts such that adjudication at summary judgment would be inappropriate.

### 3.    Likelihood of Confusion

We need not address the likelihood of confusion question since we have found that a threshold question of material fact exists regarding the first sale doctrine. Nevertheless, for the sake of completion, we next address the likelihood of confusion component of a trademark infringement lawsuit.

Maui Jim must establish that Defendants' use of its trademarks is likely to cause confusion among consumers. The Seventh Circuit has set forth seven factors to determine whether a likelihood of confusion exists. *See AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008); *see also Entm't One*, 384 F. Supp. 3d at 949. However, the Seventh Circuit also held, in a non-precedential opinion, that courts can presume likelihood of confusion where a defendant "produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product." *Microsoft Corp. v. Rechanik*, 249 Fed. App'x. 476, 479 (7th Cir. 2007) (quoting *Polo Fashions, Inc. v. Craftex, Inc*., 816 F.2d 145, 148 (4th Cir. 1987)). We will first analyze the facts under the counterfeit presumption, and then under the full seven factor test. *See Entm't One*, 384 F. Supp. 3d at 949 (quoting *Coach, Inc. v. Treasure Box, Inc*., No. 3:11 CV 468, 2013 WL 2402922, at *4-5 (N.D. Ind. May 31, 2013) ("This ... is plainly a case for presuming likelihood of confusion. But in an abundance of caution, [the Court] will take a belt-and-suspenders approach ... and proceed with the seven-factor analysis to determine whether there is a likelihood of consumer confusion.")). The party asserting infringement bears the burden of proving confusion. *See, e.g.*, *Barbecue Marx, Inc. v. 551 Ogden, Inc*., 235 F.3d 1041, 1043 (7th Cir. 2000).

### a.     Likelihood of Confusion: Counterfeit Presumption Test

Under the counterfeit presumption test, a court presumes likelihood of confusion when a defendant has produced counterfeit goods to capitalize on the popularity of another's product. *Microsoft*, 249 Fed. App'x. at 479; *Ent't One*, 384 F. Supp. 3d at 949. To be "counterfeit," the goods must have been produced by an entity that was not authorized to use the mark at the time the goods were manufactured. 15 U.S.C. § 1116(d)(1)(B); *see Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 865 (N.D. Ill. 2009) ("Counterfeiting is the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark."). Maui Jim never authorized Defendants to use its trademarks. Additionally, counterfeit goods must bear "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. And a protected mark need not appear on an item to render it counterfeit; rather, the Lanham Act only requires that the protected mark be used "in connection with" the sale. 15 U.S.C. § 1114(1)(a); *see Ent't One*, 384 F. Supp. 3d at 949–50; *see also Chloe SAS v. Sawabeh Info. Servs. Co.*, No. CV 11-04147, 2014 WL 4402218, at *7 (C.D. Cal. Sept. 5, 2014) (finding that using a word mark in the title of a sale listing constitutes counterfeiting even if the mark is not located on the product offered for sale). The Maui Jim marks were imprinted directly on the sunglasses at issue and Defendants used them in the product's website displays.

In support of Maui Jim's position that Defendants used a counterfeit mark, Maui Jim chiefly relies on the undisputed fact that three SmartBuyGlasses executives showed interest in selling Maui Jim-branded sunglasses.[15] Opposing, Defendants point to deposition testimony of

---

[15] In relevant part, one executive said: "Maui Jim will generate top sales for us if we can secure it," "Maui [J]im is a very solid online brand and will mean significant sales if we can secure it,"

Maui Jim's executives. (Pl.'s Resp. to Def's. Amend. SOF Defs.' MSJ (Dkt. 466 ¶ 7 at 9–12.)

For example, Maui Jim's CFO, Paul Lippens, testified that he could not identify any particular

pair of Maui Jim sunglasses that SmartBuyGlasses sold to a consumer that were not originally

sourced from Maui Jim. (*Id.* at 10.) Similarly, Maui Jim's VP of Purchasing, Chris McClain,

testified that he could not determine whether any plano sunglasses that Maui Jim purchased from

SmartBuyGlasses were not manufactured by Maui Jim. (*Id.*). But, Lippens' and McClain's

testimony is contrasted by the testimony of Maui Jim's digital marketing manager, Dave

Siragusa, who oversaw secret test purchases of Maui-Jim-branded sunglasses from

SmartBuyGlasses.com between 2013–2016. (*Id.* at 10.) Siragusa testified that he could indeed

tell that some of the Maui-Jim-branded glasses purchased as part of a secret test were not

manufactured by Maui Jim. (*Id.*) Lippens' and McClain's testimony is also contrasted by Maui

Jim's VP of Marketing, Mr. Black, who testified that he could tell that some of the glasses sold

through SmartBuyGlasses.com were counterfeit because they were sold "without our Maui Jim

lenses." (*Id.* at 11.)

These disputed material facts regarding counterfeiting preclude us from resolving

whether Defendants' Maui-Jim-branded sunglasses were counterfeits as a matter of law at the

summary judgment phase. For example, although there is no evidence tracing Defendants'

Maui-Jim-branded sunglass *frames* to a counterfeit manufacturer, there remains some mystery as

to where Defendant acquired some of their Maui-Jim-branded sunglasses. And to the extent that

Maui Jim's counterfeit claim is couched in the fact that Defendants' insert third-party

prescription lenses into Maui-Jim-branded eyeglass frames, as discussed later in this opinion,

---

and "when we were online with it even for a week, we were starting to get great sales." (Defs.'
Resp. to Pl.'s SOF ¶ 57.)

there remains a question of material fact as to whether Defendants adequately notified its

customers that those lenses were manufactured by Defendants, not Maui Jim.  Last, the

conflicting testimonies of Maui Jim's Lippens, McClain, Siragusa, and Black make us further

reluctant to hold that no question of material fact exists as to whether Defendants' Maui-Jim-

branded sunglasses are counterfeits.  Thus, we do not presume a likelihood of confusion at this

juncture under the counterfeit presumption test.  So, we turn to address the "likelihood of

confusion" seven factor test without relying on a presumption. *See Microsoft*, 249 Fed. App'x. at

479; *see also Ent't One*, 384 F. Supp. 3d at 949.

**b.      Likelihood of Confusion: Seven Factor Test**

To determine whether a likelihood of confusion exists we consider the following factors:

(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the

products; (3) the area and manner of concurrent use; (4) the degree and care likely to be

exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7)

the intent of the defendant to "palm off" his product as that of another. *AutoZone*, 543 F.3d at

929.  No single factor is dispositive. *Id.*  Courts may assign varying weight to each of the factors

depending on the facts presented, though usually the similarity of the marks, the defendant's

intent, and actual confusion are particularly important. *Id.*  Where the evidence is so one-sided

that there can be no doubt about how the question should be answered, the likelihood of

confusion can be resolved on summary judgment.  *See, e.g.*, *Door Sys., Inc. v. Pro-Line Door

Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996)); *NNA Properties, Inc. v. Yan Zhou*, No. 16-cv-

11117, 2017 WL 4074020, *2 (N.D. Ill. Sept. 14, 2017).

The first factor (similarity between the marks in appearance and suggestion) is assessed

by viewing the similarity of the marks as a whole, not from their "elements separated and

considered in detail." *AutoZone*, 543 F.3d at 929. The test is whether the viewer of an accused mark would be likely to associate the product with which it is connected with the source of products with which an earlier mark is connected. *Id.* at 930. Since Defendants used Maui Jim's exact marks, this factor favors Maui Jim.

The test for the second factor (similarity of the products) is whether the parties' products "are the kind the public might very well attribute to a single source (the plaintiff)." *Id.* at 931. Consumers are likely to attribute similar products to a single source when the parties compete in the same market, targeting similar consumers. *AutoZone*, 543 F.3d at 932. Maui Jim produces and sells a wide variety of Maui-Jim-branded sunglasses. Defendants advertise that the sunglasses they sell on their website are branded and produced by a variety of labels, including Maui Jim. Therefore, a reasonable consumer might believe that Maui Jim produced the Maui-Jim-branded sunglasses and authorized their sale on Defendants' website. *AutoZone*, 543 F.3d at 932. This factor weighs in favor of consumer confusion.

The third factor (the area and manner of concurrent use) assesses "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Id.* (citation omitted). Defendants sold the products at issue on the internet. Maui Jim sells its sunglasses on its own webpage, its authorized retailers' websites, and in brick and mortar retail stores. (Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶ 19.) Thus, the parties target an overlapping customer base: people looking to purchase Maui Jim products online. *See AutoZone*, 543 F.3d at 932; *see also Ent't One*, 384 F. Supp. 3d at 951. The third factor favors Maui Jim.

The fourth factor examines the degree of care likely to be exercised by sunglass purchasers to determine whether purchasers would be confused by Defendants' products. *CAE, Inc. v. Clean Air Eng'g, Inc*., 267 F.3d 660, 682 (7th Cir. 2001). The general rule guiding this

factor is "the more widely accessible and inexpensive the products . . . the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *AutoZone*, 543 F.3d at 933 (citation omitted). Some courts have tempered the weight given to this factor where there is a "strong similarity of marks and identity of goods." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 948–49 (Fed. Cir. 2000). Maui Jim argues that this factor is less significant because "no amount of care could distinguish the [Maui Jim] marks that [Defendants] use[ ] from the identical MAUI JIM Marks that Maui Jim owns, particularly where the parties use the marks on identical products." (Pl.'s Mem. (Dkt. No. 427) at 21). In assessing this factor, we consider that Maui Jim sunglasses are both premium (and so relatively expensive) and widely accessible on the internet such that Maui Jim eyewear purchasers can simply search the internet for what they believe to be the exact same product offered by a discount retailer's website like the Defendants' SmartBuyGlasses.com. Accordingly, we find that the expensiveness and wide availability in combination cause this factor to weigh neutrally. *AutoZone*, 543 F.3d at 933. Despite the neutral weight, we temper this factor considering that the marks used on Defendants' website are identical to Maui Jim's.

The fifth factor inquires into the mark's strength. The stronger the mark, the more likely it is that encroachment on it will produce confusion. *AutoZone*, 543 at 933. The strength of a trademark refers to the mark's distinctiveness, meaning its likelihood to identify the product as something emanating from a specific source. *CAE*, 267 F.3d at 684 (collecting cases); *see, e.g.*, *Ent't One*, 384 F. Supp. at 951 (citing *Coach*, 2013 WL 2402922 at *7). Maui Jim establishes that its trademarks are strong because the "Maui Jim" mark is consistently recognized by optical retailers and eye care professionals as the Sunglass Company of the Year (Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶ 13) and Maui Jim has spent millions of dollars advertising,

marketing, and promoting its good bearing the marks (Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶ 10). We also find that the Maui Jim mark is an arbitrary mark that is inherently distinctive because it is two generic words ("Maui" and "Jim") combined in a way that arbitrarily indicates that the branded object is something else. *See, e.g.*, *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 n.6 (2nd Cir. 1976) ("To take a familiar example 'Ivory' would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap."). This factor favors Maui Jim.

The sixth factor looks towards any evidence of actual consumer confusion. Maui Jim does not need evidence of actual confusion to demonstrate a likelihood of confusion. *See, e.g.*, *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685-86 (7th Cir. 2001). Both parties have received consumer feedback suggesting actual confusion regarding Defendants' retail of sunglasses bearing Maui Jim's marks. Although disputed, Maui Jim believes there are at least 181 instances of actual confusion. (Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶ 58.). The chart dubbed as the "confusion chart" (*id.*) submitted by Maui Jim shows examples of customer feedback that indicates customers' actual impressions.[16] These snippets of customer feedback, along with the other 180 cited in the statements of fact, lead us to weigh the factor for actual consumer confusion weighs favorably to Maui Jim.

---

[16] Defendants additionally argue that the underlying incidents of "actual confusion" organized into the "Confusion Chart" are inadmissible hearsay. We overrule Defendants' hearsay objection under the business record exception to the rule against hearsay. Fed. R. Evid. 803(6)(B). These documents are records of a regularly conducted activity that were made at or near the time they transpired, were kept in the course of a regularly conducted activity of a business, and making these records was a regular practice. So, these actual statements between customers and customer service representatives are admissible just like emails are commonly admissible and excepted from the rule against hearsay. Based on the record before us, we hold that the communications between customer service representatives and customers fall into this Business Record exception to the rule against hearsay.

The final factor focuses on evidence that a defendant attempted to pass off its product as having come from the plaintiff. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 731 (7th Cir. 2015). Evidence of bad faith intent to confuse consumers is particularly relevant. *Id.* Here, there is a question of material fact as to whether Defendants attempted to pass off its Maui-Jim-branded sunglasses as having come from Maui Jim for the reasons explained in this opinion's First Sale Doctrine Sponsorship section.

We cannot adequately weigh these factors due to certain disputed material facts. Even ignoring those questions of material facts, we would decline to hold at this juncture that the weight is "so one-sided that there can be no doubt about how the question should be answered" as would be necessary to resolve the likelihood of confusion on summary judgment. *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996)); *see also NNA Properties, Inc. v. Yan Zhou*, No. 16-cv-11117, 2017 WL 4074020, *2 (N.D. Ill. Sept. 14, 2017).

**B.      Trademark Dilution**

Defendants move for summary judgment in their favor on Maui Jim's trademark dilution claim. (*See, e.g.*, Defs.' Mem. MSJ (Dkt. No. 416) at 50–52.)  Maui Jim avers that it need not move for summary judgment on this point because the disposition of its Lanham Motion may render the relief sought in the dilution case duplicative and/or moot as a practical matter. (Pl.'s Mem. MSJ (Dkt. No. 427) at 39.)  We agree that the trademark dilution case is largely factually duplicative of the infringement case.  Thus, we find that addressing this issue would require factual resolution of the related and overlapping questions of material facts that make summary

judgment inappropriate as to the trademark infringement case.[17]  We therefore deny Defendants'

motion for summary judgment in their favor as to trademark dilution.

### C.  False Advertising

We turn to the parties' respective motions for summary judgment in their favor on Maui

Jim's false advertising claim.  A false advertising claim requires proof of five elements: (1) a

false statement of fact by the defendant in a commercial advertisement about its own or another's

product; (2) the statement actually deceived or has the tendency to deceive a substantial segment

of its audience; (3) the deception is material, in that it is likely to influence the purchasing

decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the

plaintiff has been or is likely to be injured as a result of the false statement, either by direct

diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *Right Field Rooftops, LLC*

*v. Chicago Cubs Baseball Club, LLC*, 136 F. Supp. 3d 911, 918 (N.D. Ill. 2015), *aff'd*, 870 F.3d

682 (7th Cir. 2017). The first element requires proof that the defendant made a false statement of

fact in a commercial advertisement about its own or another's product. *Id.*  Two types of false

statements can violate the Lanham Act: (1) claims that are literally false as a factual matter or (2)

claims that may be literally true or ambiguous that implicitly convey a false impression, are

misleading in context, or likely to deceive consumers. *Right Field Rooftops*, 136 F. Supp. 3d at

---

[17] We note the parties' disagreement as to the applicable trademark dilution law.  The applicable
law for the trademark dilution claim is the Federal Trademark Dilution Act of 1995, as amended
by the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c).  This requires a showing
that the mark is famous, that the defendant adopted an identical or similar mark, that defendant's
use likely dilutes the plaintiff's mark by blurring or tarnishment, and commercial use of the
mark. *See, e.g.*, *Joshi v. Joshi*, No. 18 C 5426, 2019 WL 3554388, at *5 (N.D. Ill. Aug. 1, 2019)
(internal citation omitted).

918 (quoting *Hot Wax*, 191 F.3d at 820). Literally false statements give rise to a presumption of deception and materiality (elements two and three). *See id.*

The record suggests that Maui Jim disputes numerous false statements made by Defendants. Maui Jim's memorandum in support of its motion for summary judgment on its false advertising case covers a few allegedly false statements. (Pl.'s Mem. Lanham MSJ (Dkt. No. 427 37–39).) We limit our discussion here to those referenced statements. *See Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2553 (citing Rule 56 for the proposition that that the movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact"). The relevant false statements for analysis here, as mentioned in Maui Jim's memorandum are: (1) Defendants' customer service representatives statements as detailed in Exhibit 32 to Statement of Fact ¶ 65, (2) Defendants' website's authenticity guarantee, (3) Defendants' Supply Chain Image, and (4) Defendants' alleged statement that it has a U.S. location. We address each in turn.

### 1.    Defendants' Customer Service Representatives' Statements

Maui Jim attached a 12–page chart entitled "SBG False Representations" as an exhibit to its Lanham Act Statement of Facts. (Pl.'s Lanham SOF ¶ 65, Ex. 32 at 11–148 (Dkt. No. 428–37).) Maui Jim's memorandum of law in support of their false advertising claims based on customer service representative statements points to this chart. (*See* Pl.'s Mem. Lanham Act (Dkt. No. 427) at 37. We addressed a few of these examples above.

Defendants contend that this segment of Maui Jim's false advertising case fails under the first element because, as a matter of law, statements made in response to consumer inquiries are

not statements made 'in a commercial advertisement.' To this extent, Courts have held that the false advertising remedy under the Lanham Act does not cover all deceitful business practices. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 316 F.3d 731, 733 (7th Cir. 2003); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*., 314 F.3d 48, 57 (2d Cir. 2002) ("businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action."). In *ISI Int'l*, the Seventh Circuit confirmed that letters to customers that misleadingly asserted that the plaintiff lacked rights to license out an invention did not fall within the scope of a Lanham Act false advertising claim. *ISI Int'l, Inc.*, 316 F.3d at 733 (7th Cir. 2003) (citing *First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001)). Similarly, in *Sanderson v. Culligan Intern. Co.*, 415 F.3d 620, 624 (7th Cir. 2005), the Seventh Circuit held that three supposedly false statements made person-to-person at trade shows were not actionable as a false advertisement claim under the Lanham Act because they were not "promotional material disseminated to anonymous recipients." *Id.* (citing *First Health Grp. Corp.*, 269 F.3d at 804). The customer service representatives' dialogue with customers or potential customers is thus not actionable as a false advertising claim because they were not 'commercial advertisements.' *Id.* Those conversations were person-to-person rather than promotional material disseminated to anonymous recipients. Accordingly, we partially grant Defendants' motion for summary judgment in their favor, and deny Maui Jim's in respective part, to the narrow extent that they seek judgment in their favor on the false advertising claims brought solely under Maui Jim's customer service representatives' false statements.

2. **Defendants' Website's Authenticity Guarantee, Supply Chain Image, and U.S. Location Image**

We next turn to three portions from Defendants' website that are allegedly literally false statements. These excerpts follow:



(Pl.'s SOF ¶ 65, Ex. 36 (Dkt. No. 428–41) at 5) ("Authenticity Guarantee"), a supply chain graphic,



(Pl.'s Resp. to Defs.' SOF (Dkt. 466) ¶ 68 (citing Ex. 35) ("Supply Chain Image"),[18] and a world

map depicting that Defendants had an "operation centre" in New York, USA,

---

[18] This diagram suggests that Defendants' supply chain is direct from the manufacturer to the costumer rather than the "traditional supply chain" that routes from the manufacturer to an exporter to an importer to a wholesaler to a shop and then to a customer. (*Id.*). That diagram also contained the following accompanying sentence: "By offering the world's largest range of authentic designer eyewear, sourced directly from the world's leading eywear [sic] suppliers, we are here to help you find what you love." (*Id.*) Dispute as to whether this diagram was factually misleading as to the Maui Jim brand exists at least in part because Defendants claim that it "was accurate and consistent with SmartBuyGlasses' practice for the majority of its sales including manufacturers/brands – such as ▮▮▮▮ and ▮▮▮▮ – from which it buys genuine products



(Defs.' Resp. to Pl.'s Lanham SOF (Dkt. No. 459) ¶ 40) ("U.S Location Image.").[19]

Defendants respond by reasoning that their website additionally contains language disclaiming these generalized terms: "With some of the brands that we sell, the manufacturers' warranty will be available worldwide however for other brands the official warranty may not be available in your country due to territorial limitations and/or brand policies. To cover all scenarios, we offer our own exclusive 24-month warranty against all manufacturers' defects

from the manufacturer of the brands and ships it to its consumers" and that they made consumers aware of this reality through disclaimers. (*Id.* ¶ 68)

[19] Although Defendants do not dispute that they do not have any physical location or physical office in New York (*id.* ¶ 41) they contend that they do have an "operational dropship location in New York." (*Id.* ¶ 40 (citing Defs.' SOAF ¶ 15).) Therefore, a question of material fact remains as to whether this statement is truthful. We were not presented with the factual differences between an 'operational dropship location,' an 'operation centre,' and a physical location. Nor have the parties articulated the difference to us at this summary judgment stage. Thus, the specific factual inquiry left for the jury is whether Defendants' 'operational dropship location' identified as an "operation centre" on the U.S. Location Image was a false statement, given the fact that Defendants do not have a physical location in New York.

without exception." (Def's. Resp. to Pl.'s SOF ¶ 69 (Dkt. No. 459 ¶ 69). As for another disclaimer, the following appears in small type on the bottom of SmartBuyGlasses.com:



(*Id.* ¶ 48.) That disclaimer states that SmartBuyGlasses is not owned by or affiliated with the brands it sells unless stated otherwise. (*Id.*) The parties dispute the impact of this sentence. As for another disclaimer, once a customer pulls up a Maui Jim specific model on the website, the customer is confronted with the following website display:



(*Id.* ¶ 51.) The last sentence of the above states in relevant part that "SmartBuyGlasses is not affiliated with nor an official re-seller for Maui Jim and therefore we provide our own comprehensive 24-month warranty, as Maui Jim do not support their own 24-month warranty with us." (*Id.*) But Defendants' Kalinko testified that he drafted that language after the litigation commenced. (*Id.* (citing Kalinko Dep. 500:13–504:2).) So, the record is unclear as to how long this disclaimer was posted.

True, the Sowers Survey[20] indicates that 40.1% of its respondents had a false impression that Defendants were an authorized retailer of Maui Jim sunglasses. Nevertheless, there remains a threshold question of material fact as to the falsity of Defendants' statements (both whether they are literally false and whether they implicitly convey a false impression) given Defendants' disclaimers[21] and the other reasons discussed above such that this issue should be brought before a jury.[22] Therefore, the parties' respective motions for summary judgment on these issues are denied.

## D.     Reverse Passing Off

Maui Jim believes that Defendants are liable for reverse passing off under 15 U.S.C. § 1125(a). Any person who uses in commerce any false designation of origin that is likely to cause confusion shall be liable to any person who believes that he or she is likely to be damaged by such act. 15 U.S.C. § 1125(a). To establish a reverse passing off claim, a plaintiff must establish that: (1) the defendant used a false designation of origin, or a false description or representation

---

[20] Defendants' dispute the results of that survey and asked us to exclude it. (Def.'s Resp. to Pl.'s SOF ¶ 70 (Dkt. No. 459 ¶ 70); Def.'s Mot. to Excl. Surv. and Test. of B. Sowers (Dkt. No. 417).) We denied that motion. (Dkt. No. 496)

[21] We are also not convinced at this juncture that the Sowers Survey is enough to resolve questions of material fact regarding falsity because it does not specifically evaluate the effects of Defendants' disclaimers.

[22] We find that the advertising issue as to third–party lenses also depends on the resolution of a question of material fact. The parties dispute whether Defendants' statements pertaining to third-party prescription lenses (less than 1% of Defendants' sales) were false. (*See* Defs.' Resp. to Pl.'s SOF ¶¶ 54–59.) On one hand, Maui Jim contends that Defendants advertised that their prescription lenses were manufactured by Maui Jim. On the other hand, Defendants contend that SmartBuyGlasses.com did not so advertise because they referred to those prescription lenses on their website with words like "our" rather than "Maui Jim's prescription lenses." (*See id.*) We are unable to say that no question of material fact exists as to whether that statement would be perceived as misleading as to who "our" pertained to (whether Defendants or Maui Jim) so we defer that question to the jury as well.

in connection with the goods or services; (2) the defendant caused the goods or services to enter interstate commerce; and (3) the plaintiff is a person who believes that he or she is likely to be damaged as a result. *See, e.g.*, *Hoopla Sports and Ent. v. Nike, Inc.*, 947 F. Supp. 347, 352 (N.D. Ill. 1996). Reverse passing off is where a party misrepresents someone else's goods' as their own. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1, 123 S. Ct. 2041, 2045 n.1 (2003); *see also Bretford Mfg. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 580 (7th Cir. 2005) ("reverse passing off . . . is selling someone else's goods under your own mark").[23] Maui Jim's Reverse Passing Off theory is rooted in Defendants' incorrect identification of ███████ as the manufacturer of Maui-Jim-branded sunglasses on commercial invoices it sent to its customers. Defendants blame this ██████ identification mishap on computer coding that operated from ██████████ (Pl.'s Resp. to Defs.' SOF (Dkt. 466) ¶ 51.) Thus, Defendants' listing of ████████ name rather than Maui Jim's name on its commercial invoices (whether intentional or mistaken) does not constitute reverse passing off since they did not represent those goods as their *own*.[25]

---

[23] We note that the Ninth Circuit held in 1981 that reverse passing of occurs "when the wrongdoer removes the name or trademark on another party's product and sells that product under *a name chosen by the wrongdoer*," rather than requiring the passed–off–name be the wrongdoer's own. *Smith v. Montoro*, 648 F.2d 602, 605 (9th Cir. 1981) (emphasis added). We follow the precise words used by the Supreme Court and the controlling Seventh Circuit and hold that Defendants must have substituted its own name for the true manufacturer to be liable for reverse passing off. *See Dastar Corp.*, 539 U.S. at 27 n.1, 123 S. Ct. at 2045 n.1; *see also Bretford Mfg.*, 419 F.3d at 580. This approach harmonizes with Supreme Court's explanatory dicta that illustrated reverse passing off as to prohibit the Coca–Cola Company from filling Coca–Cola branded bottles with Pepsi–Cola, and then selling it as Coca–Cola. *Dastar Corp.*, 539 U.S. at 32, 123 S. Ct. at 2047.

[24] According to Maui Jim, ██████ is one of Maui Jim's biggest competitors and one of Defendants' main partners. (Pl.'s Mem. Lanham MSJ (Dkt. No. 427) at 38.)

[25] Nothing on the record suggests that Defendants benefited from listing ██████ over Maui Jim as the manufacturer through the means of kick-backs paid by ██████ increased customer demand, or otherwise.

Even if the binding law tracked the Ninth Circuit's *Smith* opinion, we would still come to the same conclusion with respect to Maui Jim's reverse passing off claim. To this point, we additionally hold that Maui Jim has not shown they are likely to be damaged based on the mislabeled invoices. Maui Jim's memorandum on this point only affords the following two sentences to explaining the likelihood for damages element: "The damage to Maui Jim is established by showing a likelihood that consumers will be by SBG's identification of ███████ as the manufacturer of MAUI JIM-branded sunglasses. The record has unassailable evidence of actual confusion, which is the best evidence of a likelihood of confusion." (Pl.'s Mem. MSJ.) To the contrary, the handful of customer feedback regarding the invoice's misstatement is not enough for us to resolve the question of whether these mislabeled invoices caused a likelihood for Maui Jim to be damaged.[26]

Accordingly, we deny Maui Jim's motion for summary judgment with respect to its claims for reverse passing off.[27]

### E.     Illinois' Uniform Deceptive Trade Practices Act

Maui Jim's next seeks summary judgment on its claims for deceptive business practices under Illinois' Uniform Deceptive Trade Practices Act, 815 ILCS 510 ("UDTPA"). Plaintiff must establish the same two elements for its Lanham Act and UDTPA claims: (1) that it has a protectable trademark; and (2) that Defendants' use of the trademark is likely to cause confusion

---

[26] We note that this situation could be different had the mislabeling of the manufacturer's identity occurred on advertisements rather than post-purchase commercial invoices.

[27] Although Defendants' motion for summary judgment in their favor on the Lanham Act claims requests judgment "on all of Maui Jim's Lanham Act Claims," neither the motion nor memorandum specifically requested summary judgment in their favor on Maui Jim's reverse passing off claims. (*See generally* Defs.' Mot. MSJ (Dkt. No. 412); Defs.' Mem. MSJ (Dkt. No. 416.)) We decline to *sua sponte* raise that argument.

among consumers." *Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 948–49 (N.D. Ill. 2019) (collecting cases). Thus, the basis for summary judgment on the unfair competition claim is based on the same conduct as Maui Jim's Lanham Act case. (Pl.'s Mem. Lanham MSJ (Dkt. 427) at 38.) We therefore deny the motions for summary judgment for overlapping reasons as our denial of the Lanham Act motions for summary judgment.

## II.        Maui Jim's Copyright Claim

Maui Jim filed a separate motion for summary judgment on its copyright claim. (Pl.'s Copyright MSJ (Dkt. No. 423); Pl.'s Copyright SOF (Dkt. No. 424); Pl.'s Mem. Copyright MSJ (Dkt. No. 425).)  Defendants also move for summary judgment in their favor on the copyright claim. (Defs.' MSJ (Dkt. No. 412); Defs.' Mem. MSJ (Dkt. No. 416); Defs.' SOFs (Dkt. Nos. 415, 446, 461, 463).).  In summary, Maui Jim's copyright claim case alleges that it had copyrighted photographs (the "93 Photographs") of its sunglasses, and SmartBuyGlasses used those copyrighted images without Maui Jim's permission.

The owner of copyright has the exclusive right to use and to authorize reproduction of the copyrighted work in copies, including copies of pictorial and graphic works.  17 U.S.C. § 106(1), (5); 17 U.S.C. § 501(a).  Not all copying, however, is copyright infringement. "To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publn's, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991) (internal citation omitted); *Design Basics, LLC v. Lexington Homes, Inc*., 858 F.3d 1093, 1099 (7th Cir. 2017) (quoting *JCW Inv., Inc. v. Novelty, Inc*., 482 F.3d 910, 914 (7th Cir. 2007)).

### A. Fair Use Doctrine

Defendants assert that Maui Jim's copyright infringement case fails as a matter of law because of the fair use doctrine. The fair use doctrine is a statutory defense codified at § 107 of the Copyright Act. 17 U.S.C. § 107; *see also Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014). Under this doctrine, using another's copyrighted work is "fair" for purposes such as "criticism, comment, news reporting, teaching, scholarship, or research" and is therefore "not an infringement of copyright." *Id.* These examples "guide[ ]" the analysis under the first factor. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578, 114 S. Ct. 1164, 1171 (1994); *Red Label Music Publ'g, Inc.*, 388 F. Supp. 3d at 984. To determine whether § 107 saves a defendant in a copyright infringement lawsuit, courts consider the following factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107; *see e,g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692–93 (7th Cir. 2012); *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 983 (N.D. Ill. 2019). The burden of proof here is on Defendants because fair use is an affirmative defense, meaning that the defendant must present "evidence sufficient to withstand summary judgment." *Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003).

The first factor considers the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes. 17 U.S.C. § 107(1). "Central to determining the purpose and character of a work is whether the new work merely supersedes the original work, or instead adds something new with a further purpose or of a

different character." *Brownmark Films, LLC*, 682 F.3d at 693 (internal citation omitted).  Here, the purpose and character of the use is commercial as the parties use these copyrighted photographs to advertise and sell Maui-Jim-branded sunglasses.  Nothing in the record suggests that Defendants add something new to these photographs.  This first factor thus weighs against fair use.

The second factor focuses on the nature of the copyrighted work. 17 U.S.C. § 107(2).  Works that are creative in nature are closer to the core of intended copyright protection than are more fact-based works. *Campbell*, 510 U.S. at 586, 114 S. Ct. at 1175 (collecting cases).  Defendants argue that these 93 Photographs are merely functional, low-creativity works designed to present Maui Jim sunglasses for sale and are not creative or artistic works.  But a copyrighted work need only possess "at least some minimal degree of creativity." *Feist Publn's, Inc.*, 499 U.S. at 345, 111 S. Ct. at 1287.  "[T]he requisite level of creativity is extremely low; even a slight amount will suffice." *Id.*  "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id.* (internal quotations and citation omitted). Courts have found that photographs, even if taken partly for informative purposes, can still be creative. *See, e.g.*, *Balsley v. LFP, Inc.*, 691 F.3d 747, 760 (6th Cir. 2012) (finding that amateur photograph of a wet t-shirt contest had "a mixed nature of fact and creativity"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) ("Photographs that are meant to be viewed by the public for informative and aesthetic purposes . . . are generally creative in nature.").  Even photographs of "mundane articles of furniture" have been found to have a creative nature for copyright purposes. *See Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*, No. 2:11-CV-427, 2014 WL 11320708, at *9 (S.D. Ohio 2014) ("although the copyrighted

photographs at issue in this case depict comparatively mundane articles of furniture, they are at least as creative as the surreptitious grab shot at issue in *Balsley*.").

Here, although the 93 Photographs are mundane depictions of Maui Jim's sunglasses, we find that the process of creating those photographs necessarily included decisions about lighting, camera angle and distance, shadowing, and post-production editing. Additionally, creative judgment was necessarily exercised in selecting which photographs to use on Maui Jim's advertisements. Therefore, we hold that the second factor weighs in Maui Jim's favor against the fair use doctrine.

The third factor scrutinizes the amount taken by the alleged infringers "in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Courts sometimes ask whether the secondary use took the "heart" of the original work. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 544, 564–65, 105 S. Ct. 2218 (1985). Ultimately, "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87, 114 S. Ct. at 1175. Here, Defendants used the entirety of each photograph at issue. Thus, this factor weighs against the fair use doctrine and in favor of Maui Jim.

Last, the fourth factor addresses "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor is often the most important of the four. *See Red Label Music Publ'g, Inc.*, 388 F. Supp. 3d at 986 (citing *Kienitz*, 766 F.3d at 758). In assessing this factor, courts ask whether the contested use is a complement to the protected work (allowed) rather than a substitute for it (prohibited). *See Kienitz*, 766 F.3d at 758–59. Still, "Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." *Id.* at 590 n.21, 114 S. Ct. at 1170 n.21. Courts must "consider not only the extent of

market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Id.* at 590, 114 S. Ct. 1164 (internal citation omitted).  The 'market' in fair use cases means the potential market for not only the original work, but also derivative uses and licensing rights." *Red Label Music Publ'g, Inc.*, 388 F. Supp. 3d at 987 (citing Thomas Plotkin & Tarae Howell, *"Fair Is Foul and Foul Is Fair:" Have Insurers Loosened the Chokepoint of Copyright and Permitted Fair Use's Breathing Space in Documentary Films?*, 15 Conn. Ins. L.J. 407, 433–34 (2009) ("Even if the first three factors of the test can be satisfied, the fourth factor pre-supposes a licensing market for the copyrighted work which may render any abrogation of permission harmful, and thus not a fair use.")).

Here, we observe that Maui Jim uses its 93 Photographs for commercial purposes: to promote both its own sales and its authorized retailers' sales of Maui Jim sunglasses.  The widespread reproduction of Maui Jim's 93 Photographs by resellers who do not pay to be Maui Jim's 'authorized retailers' certainly affects Maui Jim's market for licensing the right to use these advertising photos.  Indeed, Defendants' theory that no market exists for these photographs ignores the reality that a benefit of contracting to act as one of Maui Jim's authorized retailers is the right to use these copyrighted photographs in advertisements.  Thus, this factor weighs in Maui Jim's favor and against the fair use doctrine.

There is no question of material fact that the weight of these four factors falls against application of the fair use doctrine.  Accordingly, we hold that no reasonable jury could find that Defendants' use of Maui Jim's copyrighted photographs to advertise their resale of Maui-Jim-

branded sunglasses was fair use of Maui Jim's copyrights.  We next turn to the elements of a copyright infringement claim.

### B.      Copyright Ownership Over the 93 Photographs

Maui Jim must prove that it owns a valid copyright over each of the 93 Photographs.  Under 17 U.S.C. § 410(c), the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. 17 U.S.C. § 410(c).  Here, it is undisputed that the U.S. Copyright Office issued Certificates of Registration for the 93 Photographs. (Defs.' Resp. to Pl.'s Copyright SOF (Dkt. No. 461) ¶ 8 (citing Second Amend. Compl. (Dkt. No. 257) at 145–244.)  It is also undisputed that each registration was issued within five years of Maui Jim's first publication of each of the 93 Photographs. (*Id.*)

Defendants contend that twenty-two of the 93 Photographs ("22 Photographs") at issue cannot be a basis for relief because Maui Jim did not timely register those images.   Under 17 U.S.C. § 412, statutory damages for copyright infringement are not available before the effective date of its registration, unless such registration is made within three months after the first publication of the work or one month after the copyright owner has learned of the infringement. *See, e.g.*, *FM Indus., Inc. v. Citicorp Credit Servs., Inc.*, 614 F.3d 335, 336 (7th Cir. 2010) (citing 17 U.S.C. § 412); *Intercom Ventures, LLC v. City Media Plus Ex-Yu Streaming,* No. 12-cv-10275, 2013 WL 4011052, at * 5 (N.D. Ill. Aug. 6, 2013).

On this issue, Maui Jim argues that Defendants' motion for summary judgment on these 22 Photographs should be denied because Defendants offer no evidence that they first reproduced or publicly displayed those photographs before they were registered with the U.S. Copyright

office. (Pl.'s Resp. to Defs.' MSJ (Dkt. 464) at 45.)  The parties do not dispute that the 93 Photographs were generally published on Maui Jim's website or in print between March 2015 and April 2016, even though they were not registered until August 8, 2016. (Defs.' Resp. to Pl.'s Copyright SOF (Dkt. No. 461) ¶¶ 8, 20-21, 108.)  True, even Maui Jim agrees that they "did not register its copyrights in the 22 photographs within three months after their publication." (Pl.'s Reply MSJ (Dkt. No. 490) at 45.)  But missing the three-month timeline alone does not mean that Maui Jim cannot possibly recover damages on those photographs.  Rather, 17 U.S.C. § 412 also allows damages be recovered within one month after the copyright owner has learned of the infringement.  Thus, Maui Jim can still recover statutory damages on the 22 Photographs if Defendants began its infringing conduct after the registration date. *See* 17 U.S.C. § 412(2).  The evidence on the record lapses in this respect.  Therefore, Defendants do not meet their burden to inform us of the basis for its motion in this regard, see *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553, and we deny Defendants' motion for summary judgment as to these 22 Photographs.[28]

## C.  Copying

Next, Maui Jim must prove that Defendants copied its copyrighted material without its permission. *See Feist Publn's, Inc.*, 499 U.S. at 361, 111 S. Ct. at 1296; *see also Design Basics, LLC*, 858 F.3d at 1099 (quoting *JCW Inv., Inc.*, 482 F.3d at 914).  The Copyright Act affords no protection against the independent creation of a work that happens to resemble some prior creation. *See id.*; *see also Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984) ("Proof of copying is crucial . . . no matter how similar the two works may be (even to the point of identity), if the defendant did not copy the accused work, there is no infringement.").  Recognizing that direct evidence of

---

[28] Defendants may revisit their argument concerning the 22 Photographs at trial. *See* 17 U.S.C. § 412 ("Registration as prerequisite to certain remedies for infringement.")

copying is only rarely available, a plaintiff may also "prove copying by showing that the defendant had the opportunity to copy the original (often called 'access') and that the two works are 'substantially similar,' thus permitting an inference that the defendant actually did copy the original." *Design Basics*, 858 F.3d at 1099 (quoting *Peters v. West*, 692 F.3d 629, 633 (7th Cir. 2012)).

To prove copying by circumstantial evidence, Maui Jim must show both that Defendants had both access to the 93 Photographs *and* that the photographs are substantially similar. Although the parties dispute whether Defendants' Rule 30(b)(6) deponent (Kalinko) admitted that their website displayed images of Maui Jim sunglasses, the parties agree that the 93 Photographs were published on Maui Jim's website or in print between March 2015 and April 2016, and that Defendants had access to them. (Defs.' Resp. to Pl.'s Copyright SOF (Dkt. No. 461) ¶¶ 20-21.) Further, the parties agree that Defendants did not independently create any of the 93 images of Maui-Jim-branded sunglasses it displays on its website. (Defs.' Resp to Pl.'s Copyright SOF (Dkt. No. 461) ¶ 16.)[29]

We next address the similarity between the 93 Photographs and the images on Defendants' website. The Seventh Circuit applies the 'ordinary observer' test to determine whether two works are substantially similar. *See Design Basics*, 858 F.3d at 1099 (quoting *Peters v. West*, 692 F.3d 629, 633 (7th Cir. 2012)). This test asks whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully

---

[29] Nevertheless, even if 'access' was a disputed fact, we would infer the existence of access because of the striking similarity of the works at issue. *Weller*, 312 F. Supp. 3d at 718 (quoting *Design Basics*, 858 F.3d at 1100 ("inference of access may also arise from 'proof of similarity which is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded.'")).

appropriated the plaintiff's protectable expression. *Weller v. Flynn*, 312 F. Supp. 3d 706, 720 (N.D. Ill. 2018) (quoting *Design Basics*, 858 F.3d at 1101). "With respect to photography, copyright infringement has been found where the [accused] photographer in choosing the subject matter, camera angle, lighting, etc., copies and attempts to duplicate all of such elements as contained in a prior photograph." *Bryant v. Gordon*, 483 F. Supp. 2d 605, 617 (N.D. Ill. 2007) (internal citations and quotations omitted). For the following reasons, we agree with Maui Jim to the extent that the comparisons shown in Copyright MSJ Exhibit 9 resemble *identical* images of Maui Jim sunglasses used on Defendants' website and Maui Jim's website. (*Compare* Pl.'s Mem. Copyright MSJ Ex. 9 (Dkt. 425–1) Column 4 *with id.* Column 5.) As one example:



(*Id.* at 12.) In this example, Maui Jim Copyright Registration Number VA 2-015-593 is depicted in the fourth column. That depiction is a photograph of a black pair of sunglasses facing the right. (*Id.*) This pair of sunglasses is lying on a white surface with shadows beneath both the sunglass's earpiece and each lens. (*Id.*) The fifth column contains an identical photograph hosted on Defendants' website. (*See id.*) The images of Maui Jim's sunglasses that Defendants host on their webpage are identical to Maui Jim's 93 Photographs in every way: they show the same angle, perspective, shadows and shading, colors, and positioning. Although Defendants ask us to infer that this is merely the same pairs of sunglasses shot at standard angles against a standard white background, we hold that no reasonable jury would find these photos are anything but identical. The fact that all of Exhibit 9's images contained in Column 4 and 5 appear identical

combined with the fact that there is no dispute that Defendants did not independently take or create any of those 93 images leads us to conclude that a reasonable jury could not possibly find them to be unidentical or coincidental. (Defs.' Resp. to Pl.'s Copyright SOF ¶ 16–17.) Therefore, we find that they are substantially similar and that a reasonable ordinary observer could not possibly conclude otherwise.

For these reasons, we grant Maui Jim's motion for summary judgment on its copyright infringement claims, and deny Defendants'. We leave the factual issue of calculating damages for trial.

### III.    Tortious Interference

Defendants move for summary judgment in their favor on Maui Jim's claim for tortious interference with third-party contracts. Maui Jim does not move for summary judgment on its tortious interference claim. To state a claim for tortious interference, Maui Jim must show: (1) the existence of a valid and enforceable contract between the plaintiff and another, (2) Defendants' awareness of that contract, (3) Defendants' intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach by the other caused by Defendants' conduct, and (5) damages. *See, e.g.*, *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018); *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012).

The first element that Maui Jim must show is the existence of a valid and enforceable contract between the plaintiff and another. *See Cromeens, Holloman, Sibert, Inc. v. AB Vovo*, 349 F.3d 376, 398 (7th Cir. 2003) (rejecting a tortious interference with contract claim where the plaintiffs had "not presented any evidence that [any entity] breached already-existing agreements because of [the defendant's] conduct"). The parties dispute whether Maui Jim can prove the existence of the relevant third-party contracts as a starting point. (*See, e.g.*, Defs.' Resp. to Pl.'s

SOAF (Dkt. 485) ¶¶ 101–102.)  Therefore, the question of whether Maui Jim produced enough

evidence to establish the existence of contracts between it and third-parties is based on disputed

questions of material fact such that judgment as a matter of law would be inappropriate.[30]

The second element is Defendants' awareness of that contract.  Here, there is no question

of material fact that Defendants were aware that Maui Jim contracted with authorized retailers

and that those authorized retailers were prohibited from selling to other retailers (like

Defendants).  For example, in 2008, Maui Jim wrote to Defendants the following:

> By purchasing Maui Jim sunglasses from any authorized Maui Jim
> account, you are inducing that retailer to breach its contract with
> Maui Jim, which will subject you to civil liability for interference
> with a contractual relationship.  Your continued sale of any diverted
> Maui Jim products will be considered willful and malicious.
>
> . . .
>
> Please cease and desist from attempting to procure Maui Jim
> products from any Maui Jim authorized accounts in the future.  Such
> interference would likely result in those accounts being terminated
> and you will be liable for any damage suffered by Maui Jim as a
> consequence of such termination and diversion of our product.
>
> Now that you are aware of Maui Jim's policy regarding its
> authorized retail accounts, you are on notice that future violations
> will constitute intentional interference with contractual relations.

---

[30] This necessarily defers the legal question of whether those third-party contracts are valid and
enforceable.  Insofar as Defendants contend that those contracts are unenforceable under
European law: the European Court of Justice ("ECJ") squarely addressed the legality of
authorized retailer contracts and distribution networks under TFEU Article 101 in the context of
luxury or high-end goods and ruled such contracts are not prohibited when three conditions are
met: (1) the product necessitates a selective distribution system because it is high quality or
technical; (2) resellers must be chosen on the basis of objective criteria; (3) the criteria defined
must not go beyond what is necessary. Case C-230/16, *Coty Germany GmbH v Parfumerie
Akzente GmbH*, 2017 EUR-Lex CELEX LEXIS 62016CJ0230, at ⁋ 24.  In the words of the ECJ:
"[T]he characteristics and conditions of a selective distribution system may, in themselves,
preserve the quality and ensure the proper use of such goods." *Id.*, at ⁋ 26.  Indeed, the ECJ held
that contract terms prohibiting authorized retailers from selling luxury goods through third-party
online retailers were not illegal contract terms. *Id.* at ⁋⁋ 40, 52.

(Pl.'s Resp. to Defs.' Amend. SOF (Dkt. No. 466) ¶ 100 (citing Defs.' Amend. SOF (Dkt. No. 446) Ex. 43 (available at Dkt. No. 415–59 at 2)).)  Defendants' David Menning responded and recognized a mutual understanding. (Defs.' Amend. SOF Ex. 43 (Dkt. No. 415–59) at 2.)  Thus, Defendants fail to show that there is no question of material fact that they were unaware of the relevant third-party contracts.

As to the third and fourth elements, Defendants' intentional inducement of a breach and a subsequent breach, Defendants do not address either in their motion for summary judgment on this issue. (Defs.' Mem. MSJ (Dkt. No. 416) at 57–62.)  Thus, Defendants fail to meet their burden as movant at summary judgment on these issues. *See Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2553.

Although we need not address the final element of damages, we nevertheless note that that remains a question of material fact as evidence on the record suggests that Maui Jim incurred financial harm due to Maui Jim's alleged interference with its third-party contracts. (*See, e.g.*, Defs.' Resp. to Pl.'s SOAF (Dkt. No. 485) ¶ 103.)

Accordingly, we deny Defendants' motion for summary judgment as to tortious interference.

## IV.   Defendants' Counterclaims for Defamation and Unjust Enrichment Claims

Defendants filed counterclaims for defamation and unjust enrichment against Maui Jim. (Defs.' MSJ (Dkt. No. 412); *see also* Defs.' Mem. MSJ (Dkt. No. 416) at 62–66.) Maui Jim also filed a motion for summary judgment on Counterclaimants' defamation and unjust enrichment counterclaims. (Pl.'s Counterclaim MSJ (Dkt. No. 420); *see also* Pl.'s Mem. Counterclaim MSJ (Dkt. No. 422).)  For the following reasons, Counterclaimants' motion for summary judgment as to its counterclaims is denied.

## A.    Counterclaim: Defamation *Per Se*

Counterclaimants' defamation *per se* claim is brought under Illinois law based on allegations that Maui Jim knowingly made false statements to both customers and U.S. customs officials.  These claims are bases on two incidents. (Defs.' Counterclaims (Dkt. No. 394–1 ¶ 29–30).)  First, Defendant–Counterclaims allege that Maui Jim's corporate headquarters and customer service representatives falsely instructed potential SmartBuyGlasses' customers that SmartBuyGlasses sells counterfeit goods, that the Maui-Jim-branded sunglasses they sell are 'fake' or 'not authentic,' and that SmartBuyGlasses 'is not an authentic website.' (*Id.* ¶ 29.) Counterclaimants additionally allege that Maui Jim contacted SmartBuyGlasses' customers directly and claimed that their sunglasses are not genuine. (*Id.*)  As for the second incident, Counterclaimants allege that Maui Jim falsely claimed to customs officials that Maui-Jim-branded sunglasses shipped by SmartBuyGlasses to U.S. Consumers were "not genuine," causing U.S. customs to seize their authentic sunglasses. (*Id.* ¶ 30.)

"A defamatory statement is a statement that harms a [party's] reputation to the extent it lowers the [party] in the eyes of the community or deters the community from associating with [the party]." *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1102–03 (N.D. Ill. 2016) (quoting *Green v. Rogers*, 234 Ill.2d 478, 491, 917 N.E.2d 450, 459 (2009)).  Under Illinois law, the elements of a defamation *per se* claim is "that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Id.* Illinois' courts have recognized four categories of statements that are considered defamatory *per se*: (1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office

or employment; or (4) words that prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 10, 607 N.E.2d 201, 206 (1992) (internal citations omitted). Counterclaimants reason that stating that they sold stolen goods imputes the commission of a criminal offense (category 1) and that they sold counterfeit, damaged, or used goods both imputed a want of integrity in their duties of office (category 3) and constituted words that prejudice their business (category 4).

A statement that falls into one of these categories will not be found defamatory *per se* if it true or is reasonably capable of an innocent construction. *See id.* Here, it is undisputed that Maui Jim said that Counterclaimants sold counterfeit, fake, inauthentic, or non-genuine goods through its website. (*See, e.g.*, Defs.' Resp. to Pl.'s SOF (Dkt. No. 460) ¶ 22.) But, since truth is a defense to a defamation claim, the fact that we previously found in this opinion that the legitimacy of Counterclaimants' Maui-Jim-branded sunglasses is a question of material fact for the jury, we decline to reach this question as a matter of law. Therefore, we deny the parties' motions for summary judgment with respect to Counterclaimants' defamation claims. (Defs.' MSJ (Dkt. No. 412); Pl.'s Counterclaim MSJ (Dkt. No. 420).)[31]

---

[31] Maui Jim contends that summary judgment in its favor is additionally appropriate under the unclean hands doctrine because Counterclaimants made false statements to both U.S. Customs and consumers about the manufacturer and/or source of their Maui Jim-branded sunglasses by representing that ▮▮▮▮ made them. *See, e.g.*, *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1064 (N.D. Ill. 2013), *aff'd on other grounds*, 791 F.3d 729 (7th Cir. 2015) (discussing the doctrine of unclean hands). Maui Jim contends that these false documents prompted them to make some of the statements at issue in this lawsuit. "The bad conduct constituting unclean hands must involve fraud, unconscionability or bad faith toward the party proceeded against, and must pertain to the subject matter involved and affect the equitable relations between the litigants." *Int'l Union, Allied Indus. Workers of Am., v. Local Union No. 589, Allied Indus. Workers of Am.*, 693 F.2d 666, 672 (7th Cir. 1982) (internal quotations and citations omitted). We find that this is a factual question for the jury that is inappropriate at this juncture because it turns on, among other things, the factually disputed material question as to whether Counterclaimants' inaccurate statements as to ▮▮▮▮ involvement was bad-faith misconduct or a good-faith computer coding error. (Pl.'s Resp. to Defs.' SOF (Dkt. 466) ¶ 51).

### B. Counterclaim: Unjust Enrichment

Counterclaimants' unjust enrichment claim seeks to recover the profits that Maui Jim earned through both its allegedly defamatory statements and improper use of trademark and copyright law. "[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim–and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011). Thus, to the extent that the parties' motions for summary judgment on Counterclaimants' unjust enrichment claim is premised upon the surviving defamation claim, they are denied. (Defs.' MSJ (Dkt. No. 412); Pl.'s Counterclaim MSJ (Dkt. No. 420). Similarly, to the extent those motions are premised on improper use of intellectual property law: they are denied as intellectual property claims also survive the summary judgment stage. (*Id.*)

## V. Motion to Reconsider

We next address SmartBuyGlasses' motion to reconsider pursuant to Fed. R. Civ. P. 59(e). (Mot. for Recons. ("Mot.") (Dkt. No. 378).) SmartBuyGlasses seek review of our May 10, 2019 Order that granted Maui Jim's motion to dismiss Counts IV, V, and VI, and Count II (in part) of their second amended counterclaim. (Mem. Op. and Order ("Order") (Dkt. No. 358).) For the reasons set forth below, we deny their motion to reconsider.

### A. Background

We assume familiarity with the relevant facts as detailed in our May 10, 2019 Order and thus do not fully recount them here. (Order at 2–5.) On May 10, 2019, we issued our Order granting Maui Jim's motion to dismiss Counts I, III, IV, V, and VI and dismiss in part Count II of SmartBuyGlasses' second amended counterclaim. (*Id.* at 40.) On June 2, 2019, Counterclaimant filed the instant motion for reconsideration of our Order with respect to Count

II (defamation); Count IV (violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*); Count V (violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*); and Count VI (violation of Article 101 of the Treaty on the Functioning of the European Union). (Mot. at 1.) SmartBuyGlasses contends that we committed manifest errors of law that require us to modify our Order in their favor. (*Id*. at 1–2.) Alternatively, they move to dismiss Count VI of Maui Jim's second amended complaint (tortious interference with contract) for *forum non conveniens* and international comity if we maintain our dismissal of Count VI of the counterclaim. (*Id.*)

Count II of SmartBuyGlasses' second amended counterclaim alleges defamation *per se* in connection with the fifth paragraph in Maui Jim's January 23, 2017 press release and several statements made by Maui Jim to SmartBuyGlasses potential and current customers as well as customs officials. (2d Am. Countercl. ¶¶ 26–30, 43.) We granted in part the motion to dismiss Count II based upon to the press release, finding that the statements in the fifth paragraph were protected under Illinois' innocent construction rule and thus were not actionable as defamation *per se*. (Order at 14–15.) Specifically, we found that "when the press release is read as a whole and the words given their natural and obvious meaning, the statements in the fifth paragraph refer to Maui Jim's lawsuit and its allegations, instead of a defamatory attack that can be separated from the bulk of the press release." (Order at 15 (internal quotation marks omitted) (citation omitted).) We denied in part the motion to dismiss Count II based on other statements. (Order at 11–13.) SmartBuyGlasses now moves us to reconsider our dismissal with respect to the press release. (Mot. at 1.) In the motion for reconsideration, SmartBuyGlasses contends that we committed manifest errors of law when dismissing part of Count II because we "failed to

properly apply the republication rule and erroneously believed republishing the allegations from the complaint was immunized by the litigation privilege or fair report privilege." (Mot. at 1–2.)

Count IV of SmartBuyGlasses' second amended counterclaim alleges that Maui Jim violated California's antitrust law, the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.* (2d Am. Countercl. ¶¶ 61–76.) Related,[32] Count V alleges that Maui Jim violated California's unfair competition law, Cal. Bus. & Prof. Code § 16720 *et seq.* (2d Am. Countercl. ¶¶ 77–85.) We found that SmartBuyGlasses did not adequately allege actionable injury under the Cartwright Act. The Cartwright act requires "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." (Order at 23 (citing *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000 (internal citation omitted)).) SmartBuyGlasses urges that we committed manifest errors of law since we "(i) misapprehended SmartBuyGlasses' Cartwright Act claim because SmartBuyGlasses pled injury from Maui Jim's termination of those suppliers who violate the pricing policy to sell to SmartBuyGlasses and (ii) failed to properly interpret the Ninth Circuit's holding in *Knevelbaard Dairies v. Kraft Foods*, *Inc.*[,] 232 F.3d 979, 988 (9th Cir. 2000), with respect to antitrust standing and injury." (Mot. at 2.)

Count VI of SmartBuyGlasses' second amended counterclaim alleges Maui Jim violated the Treaty on the Functioning of the European Union ("TFEU") Article 101. (2d Am. Countercl. ¶¶ 86–90.) SmartBuyGlasses alleged TFEU Article 101(1) prohibits Maui Jim's authorized retailer contracts as unlawful restraints on trade. (*Id.* ¶ 88.) We dismissed the TFEU claim on the grounds of *forum non conveniens*, relying particularly on the public interest

---

[32] Because the unfair competition law counterclaim is coterminous with the Cartwright Act counterclaim, dismissal of the latter leads to dismissal of the former. (Order at 25–26.)

factors counseling against a US court interpreting EU law. (Order at 26, 30–33.)

SmartBuyGlasses now moves us to reconsider our dismissal of its EU antitrust claim. (Mot. at 1.)

They argue that we misapplied the law of *forum non conveniens*, applied inapposite case law,

and should have dismissed Maui Jim's tortious interference claim since we dismissed

SmartBuyGlasses' EU antitrust claim. (Mot. at 12–13.)

**B.      Legal Standard**

Under Rule 59(e), district courts may entertain motions "to alter or amend a judgment."

Fed. R. Civ. P. 59(e).  Motions under Rule 59(e) will only be granted to correct manifest errors

of law or fact.  *Divane v. Krull Elec. Co.*, 194 F.3d 845, 848 (7th Cir. 1999) (citing *Moro v. Shell

Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996)).  "A party moving for reconsideration pursuant to

Rule 59(e) bears a heavy burden of establishing that the court should reverse its prior judgment."

*Scott v. Bender*, 94 F. Supp. 2d 859, 865 (N.D. Ill. 2013) (citing *Caisse Nationale de Credit

Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996)).  "Motions to reconsider

sounding under Rule 59(e) should only be granted in rare circumstances."  *Id.* (citing *Bank of

Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)).  A Rule 59(e)

motion "is not appropriately used to advance arguments or theories that could and should have

been made before the district court rendered a judgment, . . . or to present evidence that was

available earlier."  *LB Credit Corp. v. Resolution Tr.*, 49 F.3d 1263, 1267 (7th Cir. 1995)

(citations omitted).

**C.      Analysis**

**1.      Defamation Claim Related to the Press Release (Count II)**

SmartBuyGlasses avers that we "failed to properly apply the republication rule and

erroneously believed republishing the allegations from the complaint was immunized by the

litigation privilege or fair report privilege." (Mot. at 1–2.) SmartBuyGlasses summarizes the "republication rule" as "republishing one's allegations from a lawsuit to third parties, whether in a press release or other manner, is defamatory if the underlying allegations themselves are false and defamatory" and argues that "under the rule, the press release is not capable of an innocent construction." (Dkt. No. 379-1 at 2–5.) SmartBuyGlasses also assert that they did not concede that the other paragraphs of the press release are not defamatory. (*Id*. at 7.) Lastly, they argue that the Seventh Circuit's *Republic Tobacco* decision confirms that SmartBuyGlasses stated a defamation claim. (*Id*. at 11–12.) We will address each argument in turn.

As an initial matter, SmartBuyGlasses raises new arguments in this motion that it could have made before our prior ruling. A Rule 59(e) motion is not an appropriate means "to advance arguments or theories that could and should have been made before the district court rendered a judgment." *LB Credit Corp. v. Resolution Tr.*, 49 F.3d 1263, 1267 (7th Cir. 1995) (citations omitted). SmartBuyGlasses contends that Rule 54(b) governs this case because they seek reconsideration of an interlocutory, non-final order, and as a result SmartBuyGlasses did not waive its reliance on the rule. (Dkt. No. 409 at 2 n.1.) However, the stated proposition applies regardless of whether the movant raises a motion to reconsider under Rule 54(b) or Rule 59(e). *See Ace Hardware Int'l Holdings Inc. v. Masso Expo Corp.*, No. 11 C 3928, 2012 WL 182236, at *3 (N.D. Ill. Jan. 23, 2012) (motions to reconsider do "not provide a party with the opportunity to take a second bite at the apple or raise new arguments that it did not make in the first instance.") (citation omitted). SmartBuyGlasses gives no reason why it did not earlier rely on the republication rule and its newly cited cases.

More importantly, the application of the republication rule does not reverse our conclusion regarding the reasonable innocent construction of the fifth paragraph. The innocent

construction rule has the effect of exculpating an otherwise defamatory *per se* statement and is considered an exception to the republication rule.  *See Tuite v. Corbitt*, 224 Ill. 2d 490, 502, 866 N.E.2d 114, 121 (Ill. 2006) ("even if a statement falls into one of the categories of words that are defamatory *per se*, it will not be actionable *per se* if it is reasonably capable of an innocent construction.") (internal citation omitted); *Snitowsky*, 297 Ill. App. 3d at 311, 696 N.E.2d at 766 (explaining the innocent construction rule "presents an important qualification to the rule which renders a republisher liable for the original defamation despite referring to the charges of misconduct as allegations").  Thus, even if republishing one's defamatory statement is defamation *per se*, if it is subject to an innocent construction, the republished statement is protected.  *See Owens v. CBS Inc.*, 173 Ill. App. 3d at 990, 527 N.E.2d at 1305 ("Before statements will be judged defamatory as a matter of law, they must be considered in light of what has come to be known as the innocent-construction rule." (citing *Owen v. Carr*, 113 Ill. 2d 273, 278, 497 N.E.2d 1145, 1147 (Ill. 1986)).  Thus, merely asserting the republication rule, without an independent showing that the fifth paragraph is not protected by the innocent construction rule, is not enough for us to reconsider our ruling.[33]

We next find SmartBuyGlasses' contention that it did not concede that the other paragraphs of the press release are not defamatory is inconsistent with the record. SmartBuyGlasses' second amended counterclaim refers only to the fifth paragraph of the press release.  (2d Am. Countercl. at 28, 41.)  And in their opposition to Maui Jim's motion to dismiss, SmartBuyGlasses distinguished the fifth paragraph from the remainder of the press release. (Dkt. No. 231 at 9.)  For example, they stated, "[i]n looking at the press release as a whole, the

---

[33] We need not address the litigation and fair report privileges arguments because we already found that the statements are not actionable as defamation *per se*.

first four paragraphs all relate to the allegations being made in the lawsuit, but the fifth paragraph – which includes the defamatory statements – does not signal to the reader that Maui Jim is referring to allegations in its complaint."  (*Id.*)

Finally, SmartBuyGlasses has not provided a single reason why or how our holding runs afoul of the *Republic Tobacco* decision.  In *Republic Tobacco*, the Seventh Circuit upheld summary judgment to the plaintiff on its defamation *per se* claim because, among other things, each of the allegedly defamatory letters could only be read to confer liability.  *Republic Tobacco*, 381 F.3d at 733.  However, different from the letters in *Republic Tobacco*, the fifth paragraph of the press release here clearly refers to the allegations in the suit.  Therefore, unlike *Republic Tobacco*, the statements made by Maui Jim in this paragraph are protected by the innocent construction rule. Thus, SmartBuyGlasses has failed to establish that we made a manifest error of law that requires us to reconsider our dismissal of the defamation counterclaim in pertinent to the press release.

### 2.    Dismissal of the California Counterclaims (Counts IV & V)

### a.    Cartwright Act Counterclaim

SmartBuyGlasses argues that we "(i) misapprehended SmartBuyGlasses' Cartwright Act claim because SmartBuyGlasses pled injury from Maui Jim's termination of those suppliers who violate the pricing policy to sell to SmartBuyGlasses and (ii) failed to properly interpret the Ninth Circuit's holding in *Knevelbaard Dairies v. Kraft Foods, Inc.* [sic] 232 F.3d 979, 988 (9th Cir. 2000), with respect to antitrust standing and injury."  (Mot. at 2.)

These arguments are misplaced for the following reasons.  Following the Ninth Circuit's holding in *Knevelbaard*, we require that SmartBuyGlasses pleaded an actionable injury. *Id.* Under *Knevelbaard*, an actual injury has four requirements: "(1) unlawful conduct, (2) causing

an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* at 987 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)). We dismissed this counterclaim because the claimed injury at least failed the second and third requirements. (Order at 23–24.)

SmartBuyGlasses has not shown how the alleged unlawful agreements caused its injury. According to their pleadings, Maui Jim entered into Retailer Agreements with its retailers that "set minimum resale price maintenance prices and restricts to whom those retailers can sell the product." (2d Am. Countercl. ¶ 65.) SmartBuyGlasses claim that the Retailer Agreements are unlawful because they "(a) created or carried out restrictions in trade or commerce; (b) increased the price of Maui Jim sunglasses; (c) fixed the price of Maui Jim sunglasses intended for sale, barter, use, or consumption in the State of California; (c) controlled Maui Jim's sunglasses price to the public or consumer; (d) kept the price of Maui Jim sunglasses at a fixed value; and/or (e) set the Maui Jim product price to preclude free and unrestricted competition." (*Id.* ¶ 69.) However, they do not allege that they were harmed due to the price fixing agreements. In fact, as we explained in our Order, because SmartBuyGlasses claims that it is Maui Jim's direct competitor, SmartBuyGlasses would stand to gain by such agreements to raise price. (2d Am. Countercl. ¶ 54; Order at 24.)

Furthermore, the claimed injury here does not flow from the unlawful conduct alleged by SmartBuyGlasses: the price fixing practice. *Compare Knevelbaard*, 232 F.3d at 987–88 ("Since the plaintiffs allegedly were subjected to artificially depressed milk prices, the injury flows 'from that which makes the conduct unlawful,' i.e., from the collusive price manipulation itself.") *with Am. Ad Mgmt., Inc.*, 190 F.3d at 1056 ("[Plaintiff's] injury, its lost commissions, flows from the

agreement to eliminate [the] discounts.").  Instead, the injury flows either from the breaches of the contracts between Maui Jim and its retailers or from this litigation, neither of which Defendants allege violates antitrust law.

SmartBuyGlasses counters that we dismissed its counterclaim because we misapprehended that their potential gain from an inflated price may offset its harm.  (Mot. at 2.) That was not our consideration.  Nor did we require the harm to consumers and to SmartBuyGlasses be the same.  Rather, we held that the claimed injury is not actionable because it is not caused by and does not flow from the alleged price fixing agreements.  (Order at 23– 24.)[34]

### b.      Unfair Competition Law Counterclaim

The parties agree that SmartBuyGlasses' unfair competition counterclaim rises and falls with the Cartwright Act counterclaim. (Dkt. No. 379-1 at 24; Dkt. No. 400 at 16.)  And SmartBuyGlasses's request for us to reconsider the unfair competition law counterclaim is based on the same reasons as its request for us to reconsider the Cartwright Act counterclaim.  (Dkt. No. 379-1 at 24.)  Because we do not change our decision on the Cartwright Act counterclaim, we do not change our decision on the unfair competition law counterclaim.  We hold that SmartBuyGlasses has not shown that there was a manifest error of law that warrants reconsideration of our dismissal of the California counterclaims.

---

[34] SmartBuyGlasses also assert that the harm they suffer due to Maui Jim's termination of its agreements with retailers who violated the pricing policy is the kind of harm the Cartwright Act was designed to prevent.  (Dkt. No. 379-1 at 22.)  Fundamentally, SmartBuyGlasses contend that the injury meets the fourth requirement of an actionable injury.  We need not address this requirement to dismiss the counterclaim because the injury has not met the two requirements explained above.

### 3.      Dismissal of the European Antitrust Counterclaim (Count VI)

SmartBuyGlasses next asks us to reconsider our decision to dismiss Count VI of its counterclaim. (Mot. at 1.)  That claim alleged violations of European Union antitrust law under TFEU Article 101. (2d Am. Countercl. ¶¶ 86–90.)  Specifically, SmartBuyGlasses contend we applied an incorrect balancing test to dismiss their counterclaim on *forum non conveniens* grounds. (Mot. at 1, 12–13.) As explained in the following, we find no manifest errors of law in our decision and thus deny SmartBuyGlasses' motion for reconsideration on its EU antitrust claim.

First, the balancing factors heavily favored dismissal.  In this respect, SmartBuyGlasses suggests that we applied an incorrect "lesser weight" balancing test to determine dismissal of Count VI was appropriate. (Mot. at 12.)  But we decidedly *did not* apply a "lesser weight" balancing test to determine this forum was inconvenient. (Order at 30–34.)  Rather, we said that the balance tipped *slightly* in favor of Maui Jim *as to private factors*, not the analysis as a whole. (Order at 34.)  Since we did not apply an adverb the first time, we clarify that the public interest factors *heavily* tipped in favor of dismissing for *forum non conveniens*.  SmartBuyGlasses claim is at best a willful misreading of the wording of our prior order.  As such, we remind SmartBuyGlasses' counsel of their obligations under Fed. R. Civ. P. 11, and hold that there was no manifest error of law with respect to the *forum non conveniens* balancing factors.

We specifically address the public factor of comity.  Comity clearly supports dismissal because SmartBuyGlasses' claim requires our interpretation of EU antitrust law and creates a significant risk of cross-border conflicts.  SmartBuyGlasses argue that EU law invalidates Maui Jim's contract provisions, and thus they believe that our refusal to hear its antitrust claim creates a conflict.  EU law does not support SmartBuyGlasses' position on the legality of Maui Jim's

anti-diversion contracts. SmartBuyGlasses cite no cases in support of its argument that Maui

Jim's contracts are "clearly illegal." Likely this is because they are not. The European Court of

Justice ("ECJ") squarely addressed the legality of authorized retailer contracts and distribution

networks under TFEU Article 101 in the context of luxury or high-end goods and ruled such

contracts are not prohibited when three conditions are met: (1) the product necessitates a

selective distribution system because it is high quality or technical; (2) resellers must be chosen

on the basis of objective criteria; (3) the criteria defined must not go beyond what is necessary.

Case C-230/16, *Coty Germany GmbH v Parfumerie Akzente GmbH*, 2017 EUR-Lex CELEX

LEXIS 62016CJ0230, at ⁋ 24. In the words of the ECJ: "[T]he characteristics and conditions of

a selective distribution system may, in themselves, preserve the quality and ensure the proper use

of such goods." *Id*., at ⁋ 26. Indeed, the ECJ held that contract terms prohibiting authorized

retailers from selling luxury goods through third-party online retailers were not illegal contract

terms. *Id.* at ⁋⁋ 40, 52.

 The precise contours of SmartBuyGlasses' EU antitrust law claim is at best unclear.

(2d Am. Countercl. ¶¶ 86–90.) It appears their counterclaim flies in the face of an on-point

ruling from the ECJ. *Coty Germany*, 2017 EUR-Lex CELEX LEXIS 62016CJ0230 at ⁋ 72.

There is little daylight between their claim and the anti-diversion contracts that prevented sales to

online third-party distributors in *Coty*. *Id.* at ⁋ 52. Regardless, the application of EU antitrust law

to Maui Jim's particular contractual provisions requires a full inquiry into the relative harm to

competition, objective necessity of the contractual terms, benefit to competition, and the

applicability of the TFEU block exemptions from antitrust liability. *Id.* at ⁋⁋ 55, 56, 69. Thus,

SmartBuyGlasses' argument that its claim mirrors Maui Jim's tortious interference claim is false:

there are clearly a number of additional elements at work in SmartBuyGlasses' TFEU claim that

require significant independent discovery and engender legal disputes on matters of foreign law. (*Contra* Mot. at 12–13.) Therefore, there is also no contradiction in dismissing their antitrust counterclaim while keeping Maui Jim's tortious interference claim. Thus, we also decline to dismiss Plaintiff's tortious interference claim based on *forum non conveniens*.

## CONCLUSION

For the reasons discussed above, Maui Jim's motion for summary judgment is granted in part and denied in part, Defendants' motion for summary judgment is granted in part and denied in part, and Defendants' motion for reconsideration is denied. Our limited grants of summary judgment are: (1) In Plaintiff's favor on its Copyright claims (with the issue of damages left for trial); and (2) in Defendants' favor to the narrow extent that Maui Jim's false advertising theory is based solely on Maui Jim's customer service representatives' false statements. Questions of material fact exist as to all other pending claims and theories such that judgment as a matter of law is otherwise inappropriate.[35]

Honorable Marvin E. Aspen
United States District Judge

Dated: February 7, 2020
Chicago, Illinois

---

[35] As this case moves forward, in order to promote organization and clarity for the remainder of this case's litigation, every citation to the record made in a filing should include an ECF pincite.